1    Hart L. Robinovitch (AZ SBN 020910)
2    **ZIMMERMAN REED LLP**
     14646 North Kierland Blvd., Suite 145
3    Scottsdale, AZ 85254
     Telephone: (480) 348-6400
     Facsimile: (480) 348-6415
4    Email: hart.robinovitch@zimmreed.com

5    *Attorneys for Plaintiffs and the Class*

6    *(Additional Counsel listed below)*

7

8           **UNITED STATES DISTRICT COURT**

9             **DISTRICT OF ARIZONA**

10    William Ellis, Robert Dill, Edward      Case No. _____
     Rupprecht, and Robert Gustavis,
11    individually and on behalf of all others
     similarly situated,
12                       **CLASS ACTION COMPLAINT**
               Plaintiffs,
13    -v-
                      **DEMAND FOR JURY TRIAL**
14    Salt River Project Agricultural
     Improvement and Power District,
15
               Defendant.
16

17

18

19

20

21

22

23

24

25

26

27

28

Plaintiffs William Ellis, Robert Dill, Edward Rupprecht, and Robert Gustavis, (collectively referred to herein as "Plaintiffs") individually and on behalf of all others similarly situated, by and through the undersigned attorneys, hereby commence this action against Defendant Salt River Project Agricultural Improvement and Power District (hereinafter "Defendant" or "SRP").  Plaintiffs allege the following based upon personal knowledge, and based upon the investigation conducted by counsel as to all other allegations.

## I.    INTRODUCTION

1.     This case arises out of Defendant SRP's actions to unlawfully maintain its existing monopoly power over the retail delivery of electricity to customers throughout its service territory within the State of Arizona, by engaging in anticompetitive conduct designed to eliminate solar energy competition by implementing a discriminatory pricing scheme that causes common financial loss, injury and damage to Plaintiffs and other customers in the Class.  SRP's pricing plan discriminates among its customers in the Class by unfairly penalizing those consumers with solar energy systems through the imposition of higher electricity rates, while consumers without solar energy systems are subject to different, lower rates.  The discriminatory rates were adopted not for any rational reason but rather, in order to discourage further use and investment by consumers in solar energy sources that would reduce their reliance on electricity sold by SRP, thus lowering SRP's revenues.   Additionally, SRP's conduct applying discriminatory rates violates both the United States and Arizona Constitutions by treating consumers differently when purchasing the same product from a government entity.   There is no rational basis for SRP's conduct of imposing discriminatory electricity rates on class members and its conduct does not pass the requisite scrutiny to be upheld. Public policy and logic dictates that Arizona homeowners making the choice to invest in solar energy systems, an environmentally beneficial and superior choice for

1

consumers and the general public, as well as the State of Arizona,[1] should be rewarded through lower, or at least equal electricity rates as homeowners without solar, not penalized through discriminatory higher rates.   Previously, the State of Arizona promoted consumer's investment in solar energy systems due to perceived environmental and other benefits to consumers, the State of Arizona and the general public.   Based on SRP's anticompetitive, discriminatory and unconstitutional conduct, Plaintiffs seek monetary, injunctive and declaratory relief under the federal and state antitrust laws, the U.S. and Arizona Constitutions as well as other law, as set forth in further detail below.

## II.   SUMMARY OF THE CLAIMS

2.   SRP is a monopolist that provides retail electricity to customers in its designated territory within the state of Arizona. *See* https://www.srpnet.com.   As a monopolist, SRP has complete control over the electrical grid that delivers energy to consumers in its service territory.   With complete control over the electrical grid, SRP has monopoly power over the pricing, sale and distribution of electricity to all retail customers in its service territory.

---

[1]   *See generally*,  https://www.srpnet.com/menu/electricres/solar.aspx  ("Residential solar electricity: Choosing to power your home or business with solar energy is an effective way to help the environment through reduced carbon emissions.") *See also*, Office of Energy Efficiency and Renewable Energy, *The Environmental and Public Health Benefits of Achieving High Penetration of Solar Energy in the United States*, https://www.energy.gov/eere/solar/downloads/environmental-and-public-health-benefits-achieving-high-penetration-solar (last visited November 14, 2018). ("EERE aims to achieve the following strategic goals:…2. Increase the generation of electric power from renewable sources.  Through reducing the cost of hydropower and solar, wind, wave and tidal, and geothermal power, EERE can increase renewable generation."); *see also*, Office of Energy Efficiency and Renewable Energy, Solar Energy Technologies Office, *About the Solar Energy Technologies Office*, https://www.energy.gov/eere/solar/about-solar-energy-technologies-office (last visited November 14, 2018) ("The U.S. Department of Energy Solar Energy Technologies Office (SETO) supports early-stage research and development to improve the affordability, reliability, and performance of solar technologies on the grid.  The office invests in innovative research efforts that securely integrate more solar energy into the grid, enhance the use and storage of solar energy and lower solar electricity costs.")

3.     SRP's customers include residential and commercial consumers in its service territory that generate electricity through the use of solar energy systems and have invested in significant out-of-pocket cost.  Solar energy systems use technologies such as rooftop solar panels to harness light energy from the sun and directly covert it into electricity.  By generating electricity through solar energy systems, solar customers consume and purchase less electricity from SRP than they would without a solar energy system.  As a result, SRP's solar customers aim to both save money in the long run and create a public benefit by reducing their carbon footprint and creating other environmental benefits.

4.     Despite investing money in solar energy systems, customers with solar energy systems still must rely on SRP for supplemental electricity for the limited circumstances when their solar energy system produces and stores less than what they need to power their home or business.  This requires self-generating solar customers to remain on SRP's electrical grid, which therefore subjects them to SRP's unilaterally implemented electricity rates and charges.

5.     Until approximately 2014, consumer's investments in and use of solar energy systems was actively encouraged and rates for supplemental electricity needed to be purchased from SRP was fairly priced, and far from discriminatory.  That changed when SRP altered their course and implemented its new, discriminatory electricity rates in 2014 aimed at discouraging further solar energy system purchases and penalizing customers who used solar energy systems to self-generate portions of their needed electricity through higher rates.  The rate change was not in furtherance of any valid environmental, social or other policy that passes the requisite judicial scrutiny, but instead was aimed at maintaining monopoly power; impeding solar development despite its recognized benefits; quashing competition for electricity from self-generating consumers with solar energy systems; and, generating additional revenues for SRP through exploitation of its monopoly power.

6.     In 2014, in order to eliminate the growing competition from solar energy systems, maintain its monopoly power, and increase its revenues, SRP implemented a new pricing scheme called the Standard Electric Price Plans ("SEPPs").  As part of its SEPPs, SRP began the E-27 price plan for customers who self-generate electricity.  The E-27 price plan is discriminatory as it penalizes customers with solar energy systems with a substantial penalty fee that is applied monthly.

7.     Under the E-27 price plan, customers generating electricity through solar energy systems can be charged up to an additional $600 per year as compared to solar customers on SRP's prior rate plans.  This results in a substantial (approximately 65%) increase in the solar customers' bills as compared to SRP's previous rate plan.

8.     Rather than increase rate plans for all customers equally and across-the-board, SRP adopted a far smaller (approximately 3.9%) rate increase for its non-solar customers.  SRP's E-27 price plan therefore, significantly punishes and discriminates against customers that use solar energy systems and disincentivizes further purchases and use of solar energy systems.

9.     There is no rational basis for treating non-solar and solar customers differently with respect to the rates charged for the same electricity purchased from SRP.  SRP's conduct of imposing discriminatory electricity rates on Plaintiffs and the Class is unreasonable, capricious, arbitrary, and oppressive.  The discriminatory rates should not be sustained, since the basis for the rate differences has nothing to do with the electricity provided but instead are aimed at reducing competition and increasing SRP revenues by targeting customers who have interacted with SRP's competitive "enemies" for valid and legitimate reasons.

10.     SRP's effort to stifle and eliminate all competition from the growing solar energy market is clear by its implementation of the discriminatory E-27 price plan.  Customers recognize that SRP's pricing plan is discriminatory and strips the economic value in investing in solar energy systems to self-generate electricity.  This is evident by the fact that after the effective date of the E-27 price plan applications for solar energy

4

systems in the SRP territory fell significantly (by more than 90%).  Customers realize that SRP's E-27 pricing plan eliminates their ability and incentive to install and maintain solar energy systems.

11.     Additionally, SRP's penalty on solar customers is not justified by the costs SRP incurs to serve customers who use solar energy systems.  In fact, solar energy systems confer substantial benefits to the grid and to SRP itself that offset or reduce the costs of service for customers with solar energy systems.[2]

12.     SRP's recognition of the benefits offered by solar energy customers is evident by the fact that prior to the implementation of the E-27 price plan, for years SRP provided significant incentives to encourage and incentivize its customers to self-generate electricity through solar energy systems.   SRP offered these financial incentives to customers for buying or leasing solar energy systems in their homes or businesses.   For example, at one point, SRP was providing monetary incentives averaging up to $4,000 per customer to promote and encourage consumers to install solar energy systems.   There is no rational basis for such an unprecedented and dramatic reversal, except a decision by SRP to try to exclude and limit competition for electricity, and to increase SRP's revenues at Class members' expense.

13.     SRP's E-27 pricing plan unlawfully excludes competition and maintains SRP's monopoly over the retail sale of electricity.  SRP unlawfully used its position as

---

[2]     *See generally* Brookings Institute, *Rooftop solar: Net metering is a net benefit*, May 23, 2016 available at https://www.brookings.edu/research/rooftop-solar-net-metering-is-a-net-benefit/ (last visited November 30, 2018) ("The study concludes that solar power provides a substantial public benefit because it reduces electricity prices due to the displacement of more expensive power sources, reduces air and climate pollution, reduces costs for the electric grid system, reduces the need to build more power plants to meet peak demand, stabilizes prices, and promotes energy security.  These avoided costs represent a net benefit for non-solar ratepayers.  These generally positive PUC conclusions about the benefits of net metering have been supported by a national lab and several think tanks....For instance, a review of 11 net metering studies by Environment America Research and Policy Center has found that distributed solar offers net benefits to the entire electric grid through reduced capital investment costs, avoided energy costs, and reduced environmental compliance costs.")

the only authorized supplier of electricity in its service territory to eliminate the ability of solar energy systems, sold by third-parties, to compete for the substantial portion of SRP customers' retail power requirements and for SRP solar customers to save money through the solar energy they generated with their systems.

14.    SRP's E-27 price plan has substantially the same effect as requiring all of its customers to purchase their electrical power on the same terms, regardless of the customer's total electricity consumption.  As a result, it prevents consumers from taking advantage of solar energy systems purchased in order to save money, promote environmental policies, conserve natural resources and promote other beneficial policies realized through the self-generation and use of solar energy.[3]

15.    Additionally, SRP's E-27 price plan discriminates among solar customers in the rates charged for the exact same electricity.  With hundreds of customers complaining about the implementation of the E-27 pricing plan, SRP exempted certain solar customers into the previous rate plans while subjecting other solar customers to the higher rates associated with the E-27 plan.

16.    SRP's E-27 price plan applies to customers who contracted with SRP for the installation of solar panels after December 08, 2014.  As a result, SRP customers that previously installed solar energy systems or contracted with SRP for its installation as of December 08, 2014 were exempt from the E-27 pricing plan.  Certain SRP solar customers are grandfathered into the previous plan for up to 20 years.   The grandfathered SRP solar customers are saving approximately $600 a year as compared to SRP solar customers charged under the E-27 price plan.

17.    By exempting certain solar customers from the E-27 price plan, SRP

[3] U.S. Energy Information Administration, *Solar Energy and the Environment*, Aug. 31, 2018 https://www.eia.gov/energyexplained/?page=solar_environment ("Solar energy systems/power plants do not produce air pollution, water pollution, or greenhouse gases. Using solar energy can have a positive, indirect effect on the environment when solar energy replaces or reduces the use of other energy sources that have larger effects on the environment.")(last visited November 15, 2018).

discriminates against other solar customers since they are charged higher rates and fees for the exact same electricity and impact on the grid. Under the E-27 price plan, SRP also discriminates against solar customers, compared to non-solar customers, since they are charged higher rates and fees for the same electricity.

18.     SRP's adoption of the E-27 pricing plan is harmful to consumers and harmful to competition in the retail sale of electricity in its designated territory. Plaintiffs, therefore, bring this action on behalf of the Class, defined below, challenging SRP's anticompetitive, discriminatory, and unconstitutional conduct that is harmful to consumers, competition and the environment.

19.     SRP's discriminatory E-27 pricing plan is ongoing, continues to be in place and continues to cause harm and new injuries to each Plaintiff and each Class member for each day that it remains operative. New injuries and damages continue to accrue each day the E-27 rates are charged to each Plaintiff and each Class member. The Plaintiffs' and all Class members' monthly (and daily pro-rata) charges are higher than they otherwise would be each day that the discriminatory E-27 rates are in place and applied to Plaintiffs and Class members. Plaintiffs' and Class members' claims, as described further below, continue to accrue each day and will continue to do so until the rates and practices complained of are permanently suspended or enjoined.

### III.     PARTIES

20.     Plaintiff William Ellis ("Ellis") is an individual who resides in the State of Arizona and at relevant times during the Class Period has been an SRP customer.

21.     Plaintiff Ellis self-generates electricity through the use of a solar energy system that he invested money in. Plaintiff Ellis installed a solar energy system on his property on May 2018 and is subject to SRP's discriminatory rates under the E-27 price plan. Plaintiff Ellis was financially injured by SRP's conduct complained of and remains at risk for further harm in the future from the discriminatory rates charged unless enjoined.

22.     Plaintiff Robert Dill ("Dill") is an individual who resides in the State of Arizona and at relevant times during the Class Period has been an SRP customer.

23.     Plaintiff Dill self-generates electricity through the use of a solar energy system that he invested money in. Plaintiff Dill installed a solar energy system on his property on July 2018 and is subject to SRP's discriminatory rates under the E-27 price plan.  Plaintiff Dill was financially injured by SRP's conduct complained of and remains at risk for further harm in the future from the discriminatory rates charged unless enjoined.

24.     Plaintiff Edward Rupprecht ("Rupprecht") is an individual who resides in the State of Arizona and at relevant times during the Class Period has been an SRP customer.

25.     Plaintiff Rupprecht self-generates electricity through the use of a solar energy system that he invested money in.  On November 2016, Plaintiff Rupprecht installed a solar energy system on his property.  Plaintiff Rupprecht is subject to SRP's discriminatory rates under the E-27 price plan.  Plaintiff Rupprecht was financially injured by SRP's conduct complained of and remains at risk of further harm in the future from the discriminatory rates charged unless enjoined.

26.     Plaintiff Robert Gustavis ("Gustavis") is an individual who resides in the State of Arizona and at relevant times during the Class Period has been an SRP customer.

27.     Plaintiff Gustavis self-generates electricity through the use of a solar energy system.  Plaintiff Gustavis purchased a home with a solar energy system, and is subject to SRP's discriminatory rates under the E-27 price plan.  Plaintiff Gustavis was financially injured by SRP's conduct complained of and remains at risk of further harm in the future from the discriminatory rates charged unless enjoined.

28.     SRP is a governmental entity.  SRP is a political subdivision of the State of Arizona.  https://www.srpnet.com/about/elected.aspx ("The District is SRP's public utility and a political subdivision of Arizona.")  SRP is headquartered in Phoenix,

Arizona.  SRP is a power-and-water utility company comprised of two entities: the Salt River Project Agricultural Improvement and Power District ("District" and/or "SRP") and the Salt River Valley Water Users' Association ("Association").[4]

29.     The District and the Association collectively operate and are known as the Salt River Project. *See generally* http://www.srptelecom.com/AboutUs/History.aspx.  In 1903, the Association was formed by the Salt River Valley landowners as a private corporation under the laws of Arizona for the purpose of entering into contracts with the federal government for irrigation purposes.  As a private corporation, the Association serves the economic interests of the landowners that are comprised of its shareholders.

30.     In 1937, under the pressure of mounting debt, the Association formed the District for the purpose of refinancing the Association's debt by issuing interest-free municipal bonds.

31.     With the newly formed entity, the power and water storage responsibilities became that of the District.  The Association began functioning as an agent of the District by managing water delivery to Arizona residents and agricultural irrigators.

32.     Today, SRP is one of the nation's largest public power utilities and provides electricity to thousands of retail customers in its service territory.[5]

33.     As described by the Arizona Supreme Court, SRP sells electricity to residential and commercial customers in order to subsidize its expense in irrigating

---

[4]    *The Story of SRP: Water, Power, and Community* available at https://www.srpnet.com/about/history/StoryofSRP_HistoryBook.pdf.

[5]*See generally*, SRP 2018 Annual Report, available at https://www.srpnet.com/about/financial/pdfx/2018SRPCorporateAnnualReportforWeb.pdf. (last visited November 15, 2018); http://www.srptelecom.com/AboutUs/History.aspx ("The District provides electricity to 2 million people living in central Arizona.  It operates or participates in 12 major power plants and numerous other generating stations." (last visited November 27, 2018).

"private lands for personal profit." *Local 266, Int'l. Bhd. of Elec. Workers v. Salt River Project Agric. Imp. and Power District*, 275 P.2d 393, 402 (Ariz. 1954). Additionally, SRP's structure has led Arizona courts to refer to its electricity operations as a "proprietary or business function." As such, SRP does not function to serve the public but rather the financial benefit of its private shareholders.

34.     SRP recognizes that it competes with other market participants with respect to meeting the electricity needs of its customers. For example, SRP regularly meets in closed sessions to discuss what the Board agenda considers "matters relating to competitive activity, including trade secrets or privileged or confidential commercial or financial information." SRP used that exact description in a September 2018 Board meeting to consider entering into a "Solar Participation Agreement with a large industrial customer."[6]

35.     Despite the fact that SRP is deemed a political subdivision of the State of Arizona, it lacks traditional governmental powers. SRP is not recognized by the State of Arizona or by any law as a regulator or regulatory authority in the retail market.

36.     SRP's lack of governmental powers is evident by the fact that it cannot impose ad valorem property taxes or sales taxes or enact laws governing citizens' conduct. SRP cannot administer normal governmental functions such as the maintenance of streets, the operation of schools, or sanitation, health or welfare services. Furthermore, Arizona courts have held that SRP employees can strike under their labor contract, SRP is not exempt from a city's exercise of eminent domain, nor is it immune from tort liability. Furthermore, SRP cannot levy taxes against the general public only against its landowners.

37.     SRP is not subject to the regulatory authority of the Arizona Corporation Commission ("ACC"), the state's utility regulator, over its retail operations. Unlike other utility providers, SRP is not under the ACC's jurisdiction for rates, rules, and

---

[6]  https://www.srpnet.com/about/boardagenda/AgendaPage.aspx?DocID=61756&Secondary=true

regulations.  Therefore, SRP is free to engage in the alleged misconduct without any oversight.

38.     Despite the foregoing, as a political subdivision of the state, SRP remains a governmental entity and subdivision that is subject to constitutional challenges for its discriminatory conduct.

## IV.     JURISDICTION AND VENUE

39.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and 1337(a) as well as 15 U.S.C. § 22.   This Court has supplemental jurisdiction over the Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367.

40.     This Court has personal jurisdiction over the parties because the Defendant is a resident of this judicial district, and is formed under the laws of the State of Arizona.  Plaintiffs and class members are residents of the State of Arizona and this District.

41.     Venue is proper in this District pursuant to 28 U.S.C. § 1391, because Defendant is a resident of this judicial district and its alleged conduct occurred, and continues to occur, in this District.  Accordingly, this Court has jurisdiction over this action and venue is proper in this District.

## V.     FACTUAL ALLEGATIONS APPLICABLE TO ALL COUNTS
**A.     SRP Maintains Monopoly Power in the Relevant Market or Markets.**

42.     The relevant market is SRP's service territory in the state of Arizona. SRP's service territory is comprised of three Arizona counties, including most of the Phoenix metropolitan area. *See generally* Map of SRP electric service area, found at https://www.srpnet.com/about/servicearea.aspx ("Below is a list of cities served all or in part by SRP electric power: Apache Junction, Avondale, Chandler, Fountain Hills, Gilbert, Glendale, Mesa, Paradise Valley, Peoria, Phoenix, Queen Creek, Scottsdale, Tempe, Tolleson.") (last visited November 26, 2018).   Plaintiffs reside in and purchased electricity from SRP in the relevant market.

11

43.     The relevant product market is the delivery and sale of electric power to residential and commercial consumers within SRP's service territory.  Electric power can be obtained by purchasing power directly from SRP, or it can be obtained by leasing or purchasing a rooftop solar energy system from a third-party which allows consumers to self-generate power on his or her own property.

44.     In the retail market, SRP directly competes with solar energy system installers operating in the State of Arizona.  By leasing or selling equipment that allows customers to self-generate electricity, third-party solar installers compete with SRP.  In making such investments and using solar energy systems that they purchase or lease, solar energy customers significantly reduce the amount of electricity that they need to purchase from SRP.  Despite investing in solar energy systems to self-generate electricity, solar energy consumers must still purchase some electricity from retail electricity providers such as SRP to supplement the electricity that they self-generate.

45.     SRP recognizes that solar energy systems sold to class members by third-party vendors (for example, Solar City) are its direct competitors in the provision of electric power.  SRP spent approximately $1.7 million on advertising in a span of three months to promote its increased rates for solar customers.  This large advertising budget was for the purpose of diminishing the increasing demand for solar energy systems.  Financial records and emails obtained from SRP revealed an SRP executive referring to solar energy systems, installers and advocates as "the enemy" during the pricing process.[7]

---

[7]  Randazzo, Arizona Republic, *SRP ads, PR for solar rate hike topped $1 million*, May 13, 2015, available at https://www.azcentral.com/story/money/business/2015/05/14/srp-ads-pr-solar-rate-hike-topped-million/27284303/ (last visited November 15, 2018) ("SRP's director of customer programs Lori Singleton wrote to HighGround President J. Charles Coughlin while out of town on business Dec. 9, after the solar fees were proposed and the deadline passed to apply for solar in SRP territory under the old rate schedule."  Lori labeled the subject line of the exchange "The Solar Tax Issue."  Her email stated, "Hold the fort down ... feeling restless while the enemy is preparing for attack!")

46.     SRP's competition with solar energy systems and third-party vendors selling and installing solar energy systems is well documented.  The Edison Electric Institute, a utility trade group that represents U.S investor-owned electric utilities, has published articles that acknowledge the direct nature of competition in the retail market between solar energy systems and electric utilities such as SRP, highlighting the "competitive threat" and "disruption" solar energy companies present to electric utilities' business model, and how that "threat" can be addressed to utilities' financial benefit through the adoption of new pricing, rates and policies aimed at discouraging and reducing consumers' investment in and use of solar power systems despite the cost advantages, environmental and the public policy benefits that solar power use is acknowledged to present:

> Today, a variety of disruptive technologies are emerging that may compete with utility-provided services. Such technologies include solar photovoltaics (PV), battery storage, fuel cells, geothermal energy systems, wind, micro turbines, and electric vehicle (EV) enhanced storage. As the cost curve for these technologies improves, they could directly threaten the centralized utility model.  To promote the growth of these technologies in the near-term, policymakers have sought to encourage disruptive competing energy sources through various subsidy programs, such as tax incentives, renewable portfolio standards, and net metering where the pricing structure of utility services allows customers to engage in the use of new technologies, while shifting costs/lost revenues to remaining non-participating customers.

> * * *

> The threat to the centralized utility service model is likely to come from new technologies or customer behavioral changes that reduce load. Any recovery paradigms that force cost of service to be spread over fewer units of sales (i.e., kilowatt-hours or kWh) enhance the ongoing competitive threat of disruptive alternatives. While the cost-recovery challenges of lost load can be partially addressed by revising tariff structures (such as a fixed charge or demand charge service component), there is often significant opposition to these recovery structures in order to encourage the utilization of new technologies and to promote customer behavior change.

> But, even if cross-subsidies are removed from rate structures, customers are not precluded from leaving the system entirely if a more cost-competitive alternative is available (e.g., a scenario where efficient energy storage combined with distributed generation could create the ultimate risk to grid viability). While tariff restructuring can be used to mitigate lost revenues, the longer-term threat of fully exiting from the grid (or customers solely using the electric grid for backup purposes) raises the potential for irreparable damages to revenues and growth prospects. This suggests that

13

an old-line industry with 30-year cost recovery of investment is vulnerable to cost-recovery threats from disruptive forces.

* * *

According to the Solar Electric Power Association (SEPA), there were 200,000 distributed solar customers (aggregating 2,400 megawatts or MW) in the United States as of 2011. Thus, the largest near-term threat to the utility model represents less than 1 percent of the U.S. retail electricity market. Therefore, the current level of activity can be "covered over" without noticeable impact on utilities or their customers. However, at the present time, 70 percent of the distributed activity is concentrated within 10 utilities, which obviously speaks to the increased risk allocated to a small set of companies. As previously stated, due to a confluence of recent factors, the threat to the utility model from disruptive forces is now increasingly viable. One prominent example is in the area of distributed solar PV, where the threats to the centralized utility business model have accelerated due to: [list]…

* * *

Summary:

While the threat of disruptive forces on the utility industry has been limited to date, economic fundamentals and public policies in place are likely to encourage significant future disruption to the utility business model. Technology innovation and rate structures that encourage cross subsidization of DER and/or behavioral modification by customers must be addressed quickly to mitigate further damage to the utility franchise and to better align interests of all stakeholders.

Utility investors seek a return on investment that depends on the increase in the value of their investment through growth in earnings and dividends. When customers have the opportunity to reduce their use of a product or find another provider of such service, utility earnings growth is threatened. As this threat to growth becomes more evident, investors will become less attracted to investments in the utility sector. This will be manifested via a higher cost of capital and less capital available to be allocated to the sector. Investors today appear confident in the utility regulatory model since the threat of disruptive forces has been modest to date. However, the competitive economics of distributed energy resources, such as PV solar, have improved significantly based on technology innovation and government incentives and subsidies, including tax and tariff-shifting incentives. But with policies in place that encourage cross subsidization of proactive customers, those not able or willing to respond to change will not be able to bear the responsibility left behind by proactive DER participating customers. It should not be left to the utility investor to bear the cost of these subsidies and the threat to their investment value.

This paper encourages an immediate focus on revising state and federal policies that do not align the interests of customers and investors, particularly revising utility tariff structures in order to eliminate cross subsidies (by non-DER participants) and utility investor cost-recovery uncertainties. In addition, utilities and stakeholders must develop policies and strategies to reduce the risk of ongoing customer disruption, including

14

assessing business models where utilities can add value to customers and investors by providing new services.

While the pace of disruption cannot be predicted, the mere fact that we are seeing the beginning of customer disruption and that there is a large universe of companies pursuing this opportunity highlight the importance of proactive and timely planning to address these challenges early on so that uneconomic disruption does not proceed further. Ultimately, all stakeholders must embrace change in technology and business models in order to maintain a viable utility industry.[8]

47.     Upon information and belief, SRP implemented the discriminatory electricity rates at issue for the same or similar reasons as those discussed in the above-cited Edison Electric Institute report – namely, to use its monopoly power over electricity rates to harm competition from third-party solar energy system providers, discourage the use and expansion of self-generating solar power by consumers in the Class by making it more expensive for them to do so, and increase revenues.

48.     SRP has monopoly power in the retail market within the geographic market, as it currently provides electricity to approximately 1 million customers in a 2,900 square-mile service area. *See generally*, https://www.srpnet.com/about/servicearea.aspx.[9]  SRP's monopoly power is apparent since it currently provides more than 95% of the electricity used by retail customers in its service territory

49.     SRP provides electricity through a variety of plans and sources in order to maintain its monopoly power.  For example, SRP implemented its Community Solar Program, which allowed customers to purchase solar-generated electricity without

---

[8]  Edison Electric Institute, *Disruptive Challenges: Financial Implications and Strategic Responses to a Changing Retail Electric Business*, January 2013, at *3-4 and 19, available at http://www.ourenergypolicy.org/wpcontent/uploads/2013/09/disruptivechallenges-1.pdf (last visited November 30, 2018).

[9]  *See also* http://www.savewithsrp.net/about/FAQ.aspx ("Do I have a choice of electric companies?  Under the Electric Power Competition Act of 1998, SRP service territory is open to competitive electricity suppliers. However, at this time no competitive electricity suppliers are certified by the Arizona Corporation Commission.  Therefore, your electric company is determined by where you live.  Please see the page about SRP's service area.")

installing a solar energy system on their property.  SRP's Community Solar Program served as a substitute for solar energy systems and was presented as such.

50.     Another example of SRP's monopoly power is its ability to funnel its profits from the electric operations and use them to funds its money-losing water operations.

51.     SRP's exercise of monopoly power also extends to its control over the electrical grid access within the geographic market.

52.     Regardless of whether customers are able to self-generate electricity through a solar energy system, all customers within SRP's service territory generally must purchase some retail electricity from SRP.  In particular, solar energy customers remain on the electrical grid to purchase electricity from SRP in order to have power at times when their solar energy system cannot fully meet their needs for electric power. Since technologies that would allow consumers to completely remain off of the grid are not yet economically viable, SRP maintains monopoly power over consumer demand.

53.     Furthermore, SRP's exercise of monopoly power is a result of its own doing and not the result of any state policy to prevent competition.  The Arizona legislature expressly supports competition in the retail supply of electricity.

54.     Arizona's legislature intended to force SRP to open to competition by enacting the Electric Power Competition Act of 1998, A.R.S. § 30-801 *et seq.* (the "Act").  The Act, *inter alia*, requires SRP to open its entire service territory to competition for the sale of electric power to retail customers through SRP's grid access facilities. A.R.S. § 30-803.

55.     SRP acknowledges the Arizona legislature's intent to open competition from other electricity suppliers. In SRP's 2010 Rules and Regulation, it acknowledged that "SRP's service territory is open to competition…in accordance with the Arizona Electric Power Competition Act."[10]

---

[10]  https://www.srpnet.com/about/pdfx/rulesandregs10042010.pdf

56.    The Act prohibits SRP from using "any reduction in electricity in purchases…resulting from self-generation" to rationalize calculating or recovering costs that constitute "stranded costs". A.R.S. § 30-805(D).

57.    The Act provides that discriminatory prices for electricity are unlawful. A.R.S. § 30-805 (A)(1) and (2) ("Public power entities shall: 1. Establish unbundled ancillary electric transmission and distribution and other service prices and terms and conditions that are nondiscriminatory and that reflect the just and reasonable price for providing the service.")

58.    The Act further prevents SRP from considering "the profits or losses associated with electric generation service in establishing electric distribution service prices." A.R.S. § 30-805 (A)(1) ("…Except as provided in paragraph 3[11], public power entities shall not consider the profits or losses associated with electric generation service in establishing electric distribution service prices".)

59.    The Act expressly provides that the antitrust laws apply to SRP's anticompetitive conduct. A.R.S. § 30-813.

**B.    SRP's Prior Course of Conduct Acknowledged the Benefits Associated with Solar Energy Systems.**

60.    Solar energy systems generate electricity at or near the site where it will be used, by converting sunlight into electricity.  Through the use of solar panels, the solar energy systems are able to generate electricity by capturing the sun's energy.  The amount of electricity that is generated can vary based on the residential or commercial property's orientation and size of the solar panels.

61.    Solar energy systems provide renewable energy without producing emissions and other negative environmental effects.  Solar energy systems also allow for peak production of electricity during peak-demand periods (*i.e.*, daylight hours).

---

[11]    Paragraph 3 of the referenced subsection applies to temporary surcharges which relate to circumstances not applicable to the current action (unmitigated stranded costs incurred as a direct result of competition before December 26, 1996).

62.     Class members' use of solar energy systems not only benefits the environment and the general public, but also utility companies such as SRP.  Benefits from solar energy systems include providing renewable energy, reducing transmission costs, and helping SRP meet its environmental requirements and goals.  In addition, electricity generated by solar energy systems in SRP's service territory assists in meeting electricity demand during peak hours, especially during the summer.[12]

63.     The benefits of solar energy systems were previously recognized by SRP as it offered financial incentives to customers to encourage the installation of solar systems.  For example, SRP previously offered residential and commercial customers incentives in the form of "net metering".[13]

64.     Net metering is a solar incentive program that allows customers to receive credit on their bill for generating excess electricity.  With net metering, the excess electricity is stored into the grid and purchased at retail rates by other customers.  Therefore, with net-metering SRP solar energy customers would be billed for the energy they used from the grid minus the excess electricity they produced.  SRP provided the net metering program for years to the benefit of its solar customers, until the program's solar incentives were reduced or eliminated.

65.     Solar energy systems increased in popularity and affordability due to supportive federal and state policies.  Given this increasing demand for solar systems, SRP recognized it as a competitive threat in the long term.

---

[12] *See* Frontier Group, *Blocking the Sun, Utilities and Fossil Fuel Interests That are Undermining American Solar Power, 2016 Edition*, Dec. 1, 2016, available at https://www.energyandpolicy.org/60-plus-association/ (last visited November 30, 2018); *see also* Brookings Institute, *Rooftop solar: Net metering is a net benefit*, May 23, 2016.

[13] *Arizona Vote Puts an End to Net Metering for Solar Customers*, December 21, 2016 available at https://www.greentechmedia.com/articles/read/arizona-vote-puts-an-end-to-net-metering-for-solar-customers#gs.EVnrDIc ("The Tuesday decision also establishes rooftop solar customers as a separate rate class, and eliminates the "netting" or "banking" of solar power credits to offset usage in later months….")

66.    In response to this growing threat, SRP announced its Community Solar Program which allowed customers to purchase solar-generated electricity without installing a solar energy system.  SRP promoted the Community Solar Program as a direct competitor to solar energy systems. This program allowed SRP to receive environmental attributes to satisfy its sustainable energy goals.

67.    Through the Community Solar Program, SRP contracted to purchase solar energy from the Iberdrola Renewables' Copper Crossing Farm in Florence, Arizona. Once SRP purchased the solar energy, SRP customers participating in the program would be able purchase shares of that solar energy without buying or leasing a solar system.

68.    SRP's Community Solar Program failed to meet the competition from solar energy systems as it demonstrated low participation rates.  The lack of customer participation was mainly attributed to the fact that the program failed to pass on actual bill savings to participating customers.

69.    In December 2013, SRP was forced to lower the rates for the Community Solar Program plan in order to compete with the increasing installation of solar energy systems.[14]  According to Lori Singleton, SRP's manager of solar efforts, "it is difficult to compete with solar companies that sell their services as a savings, and even more difficult to offer community solar as a competitive alternative to (less expensive) power because the solar companies take SRP's solar incentives."[15]

70.    Unaccustomed to competition, SRP eliminated incentives to install solar energy systems.  However, the lack of incentives failed to stop the demand for solar energy systems.  In 2013, SRP had one of the highest rates of solar energy system

[14]  https://www.azcentral.com/story/money/business/2014/04/22/srp-community-solar-prices-cut/8015135/

[15]  http://my.solarroadmap.com/userfiles/NCSC-Salt-River-Project-Case-Study_FINAL.pdf

installation in the nation.[16]  According to the Solar Electric Power Association, in 2013 SRP was considered the eighth-highest U.S. utility company for the interconnection of solar energy systems.

**C.    SRP Implements the SEPPs Price Plans to Eliminate Solar Competition.**

71.    In response to the competitive threat posed by solar energy systems, SRP committed to eliminate solar energy competition through its monopoly power.[17]

72.    In 2014, SRP introduced new price plans called the Standard Electric Price Plans ("SEPPs"), which includes the E-27 price plan to apply new service terms and rates to solar customers.  In order to gather support for its new rates, SRP spent about $1.7 million to advertise the adoption of its new price plans.[18]

73.    On February 26, 2015, SRP's Board of Directors approved the new price plans, which imposed new rates for all SRP customers.  The implementation of SRP's E-27 plan reflects SRP's intent to eliminate competition associated with solar energy systems.  An email obtained from an SRP executive in reference to solar energy stated: "Hold the fort down…feeling restless while the enemy is preparing an attack."  Rather

---

[16]  https://www.pv-magazine.com/2014/12/05/arizona-utility-rate-changes-could-price-solar-out-of-phoenix_100017424/

[17]  See Frontier Group, *Blocking the Sun, Utilities and Fossil Fuel Interests That are Undermining American Solar Power, 2016 Edition*, Dec. 1, 2016, available at https://www.energyandpolicy.org/60-plus-association/ (last visited November 30, 2018)("This report documents 17 fossil fuel backed groups and electric utilities running some of the most aggressive campaigns to slow the growth of solar energy in 12 states, including eight attempts to reduce net metering benefits, seven attempts to create demand charges for customers with solar power, and five efforts to roll back renewable energy standards…. The Salt River Project implemented a demand charge that has all but killed distributed solar energy growth in its territory.")

[18]  R. Leger, *SRP spent too much on ads ... but who can blame them?*, Arizona Republic, May 14, 2015 available at https://www.azcentral.com/story/robertleger/2015/05/14/srp-solar-rate-increase-advertising-spending/ 27337247/ ("And, yes, it was out of line when SRP's director of customer programs, Lori Singleton, wrote in an email to the company's public relations consultant: "Hold the fort down ... feeling restless while the enemy is preparing to attack!" A utility leader shouldn't think of solar companies as the enemy.")

than disclaim the statement, SRP claimed the employee was merely joking in reference to solar energy being the "enemy".

74.     According to the adopted SEPPs rates, SRP customers who purchase all of their electricity from SRP follow the traditional rate structure.  These customers are charged per kilowatt-hour (kWh) of electric usage along with a monthly service charge. SRP increased the monthly service charge to an estimated $17 to $20 for customers who depend on SRP for all of their electricity.  This increase in the monthly service charge translates to an approximate 3.9% rate increase.

75.     As for SRP solar energy customers, the SEPPs pricing plan includes a distinct rate plan known as the E-27 Customer Generation Price Plan for Residential Service ("E-27").   The E-27 price plan is a demand based rate plan, which is exclusively applied to SRP's customers who use solar energy systems to self-generate electricity for their property.  The E-27 plan for solar energy customers includes a high "distribution charge" of approximately $16.64 or $29.64 per month.  In comparison, SRP charges its non-solar customers approximately $4.20 as an equivalent "distribution charge".  This discriminatory distribution charge is included in the total monthly service charge SRP applies to all customers.  While SRP applies an approximate $20 monthly service charge for its non-solar customers, a monthly service charge for SRP solar customers can range from approximately $32.44 to $45.44.

76.     In addition to a higher distribution charge, SRP solar customers are charged a monthly "demand charge" for each kilowatt of usage calculated in the solar customer's most intensive 30 minute peak period, regardless of who generates the power used during that peak period.   SRP's "demand charge" is only applied to customers with solar energy systems.

77.     The discriminatory demand charge can range from $30 in the winter time to hundreds of dollars in the summer peak months.

78.     According to SRP data, solar customers subject to the E-27 plan will pay approximately an additional *$600 a year* compared to what that customer would have

paid under the previous rate plans that applied to solar customers.  Customers subject to the E-27 pricing plan are likely charged even more if they are unable to decrease their power usage during SRP's peak period.

79.     Furthermore, solar customers under the E-27 plan are required to maintain service under this discriminatory plan for as long as they are self-generating electricity with a solar energy system.  Since the demand charge is only applied with a solar energy system, if a customer opted to remove his or her solar energy system the demand charge would no longer be applied to their monthly bill.

80.     The E-27 plan has the purpose and effect of significantly reducing future installations of solar energy systems.  This is evident by the fact that SRP "grandfathered" already existing solar customers into its previous rate plan.

81.      By making the E-27 pricing plan retroactive to December 08, 2014, and grandfathering existing customers into the previous rate plans, SRP discriminates among solar customers.  The grandfathered customers are neither subject to the higher distribution fee nor the demand charge associated with the E-27 pricing plan.  Likewise, SRP's non-solar customers are not subject to the E-27 price plan.

82.     The E-27 pricing plan therefore discriminates against SRP's solar customers as they pay higher electricity rates in relation to both: (a) non-solar customers; and (b) those solar customers grandfathered into SRP's previous rate plan.

83.     SRP's anticompetitive intent in imposing the discriminatory rates on solar customers is evident by the fact that there is no difference in usage pattern between the new solar customers that are subject to the discriminatory charges associated with the E-27 plan and the grandfathered solar customers.  The only difference between these customers is the fact that the new solar customers represent loss of business to competitors.

84.     Based on the dramatic pricing increase for solar customers subject to the E-27 plan, it is apparent that the purpose of SRP's E-27 plan is not to recoup reasonable grid-related costs from solar energy customers, but to prevent competition from solar

energy systems by penalizing customers for installing these systems and creating disincentives to purchase or lease them.  Since all solar customers remain on the electric grid, SRP is singling out and punishing solar customers with higher prices on the limited power they purchase from SRP.

85.   SRP is well aware that customers are unlikely to make an economically unsound decision in purchasing and installing new solar energy systems if it results in paying a higher amount for power, thereby eliminating demand for solar energy systems in SRP territory.

86.   SRP's implementation of its discriminatory pricing plan resulted in a significant drop in new applications for the installation of solar energy systems in SRP territory.  It is estimated that this decrease in solar installations ranges from 50 to 96 percent.[19]

87.   SRP adopted the rates in an attempt to get consumers, including members of the Class to obtain their electrical power needs exclusively from SRP.

88.   SRP's anticompetitive intent and affect is evident by, *inter alia*, the fact that one of the largest installers of solar energy systems in the state of Arizona began

---

[19]  IEEE Spectrum, *Utilities and Solar Companies Fight Over Arizona's Rooftops*, June 15, 2015, available at https://spectrum.ieee.org/green-tech/solar/utilities-and-solar-companies-fight-over-arizonas-rooftops ("The utility backlash got real in recent months as Arizona utilities levied or proposed new fees for customers installing rooftop solar systems.  Tempe-based Salt River Project (SRP), which serves much of greater Phoenix, has seen applications to connect solar systems drop 96 percent since it announced a new rate structure in December 2014.  SRP now exacts a monthly "demand charge" based on the maximum level of grid power that solar customers consume during its 1 to 8 p.m. peak demand period.  Altogether, SRP's fee changes add about US $50 per month to solar users' bills, wiping out the economic gains of producing rooftop solar power."); *see also* Kennedy, *Salt River Project Rate Hikes Threaten Arizona Solar Viability*, Pick My Solar, Jan 20, 2016 available at https://blog.pickmysolar.com/salt-river-project-rate-hikes-threaten-arizona-solar-viability ("The rate hike, amounting to about $50 per month for solar customers, ultimately strips solar power of its economic viability in SRP's territory.  Understandably, the rate hike has been accompanied by a significant drop in new rooftop solar applications in the area, with estimates for the decrease ranging from over 50% to 96 %.")

relocating employees to other states following the implementation of SRP's SEPPs rates, in particular the E-27 pricing plan.[20]

**D.     SRP's Unlawful Conduct in Implementing the SEPPs Harms Consumers.**

89.     SRP solar customers that are subject to the E-27 plan under the SEPPs are harmed due to the unreasonable and discriminatory charges they are required to pay. As reported by SRP data, solar customers under the E-27 pricing plan are paying approximately $600 more a year as compared to the previous rate plan.

90.     In reality, the E-27 plan has resulted in solar energy customers paying even more than the estimated $600 a year due to the unpredictable demand charges. Solar customers who are unable to drastically reduce their demand use during the SRP designated peak hours are paying even more than the originally estimated charges.

91.     The damages associated with SRP's discriminatory pricing plan also extends to customers SRP grandfathered into the previous plans.  SRP's grandfathered solar customers are exempt from the E-27 demand plan until the later of May 31, 2025 or the date that is twenty years from when SRP interconnected their solar energy system.  Once this exemption period ends, the grandfathered solar customers will be subject to the excessive rates associated with the E-27 plan.

---

[20]     https://www.azcentral.com/story/money/business/2015/04/30/solarcity-relocating-arizona-workers/26614771/. See also, *Arizona Vote Puts an End to Net Metering for Solar Customers*, December 21, 2016 available at https://www.greentechmedia.com/articles/read/arizona-vote-puts-an-end-to-net-metering-for-solar-customers#gs.EVnrDIc ("….As a top U.S. solar market, Arizona's rate change is likely to set a worrisome tone for residential solar advocates heading into 2017 -- particularly the country's leading solar leasing companies that have driven the most market growth to date.  As a top U.S. solar market, Arizona's rate change is likely to set a worrisome tone for residential solar advocates heading into 2017 -- particularly the country's leading solar leasing companies that have driven the most market growth to date."  Over the past year, we've seen a wave of more complex net energy metering and rate reform proceedings reassess rooftop solar policies.   With this decision, however, Arizona's residential solar market is at risk of falling out of the top 5 state markets," said Cory Honeyman, associate director for U.S. solar at GTM Research. "Valuing residential PV exports primarily based on utility solar PPA pricing is the definition of an apples-to-oranges comparison.")

24

92.     By implementing the E-27 plan, SRP has made it economically unfeasible for customers to install solar energy systems.  It strips class members in SRP's service territory from exercising their choice to use solar in order to meet the power needs of their property.

93.     Additionally, rather than discontinue its unlawful and discriminatory conduct, SRP is encouraging solar customers to purchase battery storage systems, at additional costs, to *potentially* curb the discriminatory demand charges associated with its E-27 pricing plan.

94.     A battery storage system allows solar customers to store energy generated through a solar energy system.  The stored energy would be used during SRP's peak hours when the demand charges are accumulated.  Therefore, a battery storage system could potentially assist in preventing a high monthly demand charge by allowing solar customers to use their previously stored energy.

95.     The cost of the battery storage system is significant.  Therefore, solar customers are required to spend a substantial amount of money to purchase and install a battery storage system to try and decrease the demand cost associated with SRP's discriminatory E-27 plan.

**E.     There is No Rational Basis for SRP's Decision to Adopt the Discriminatory Price Plan.**

96.     There is no rational basis for SRP's decision to adopt the discriminatory rate plan that causes significant damage to Plaintiffs and the Class.

97.     A governmental entity's desire to reap additional revenue cannot provide justification for a decision to impose a discriminatory rate structure that damages consumers in the group that is discriminated against.

98.     A.R.S. § 30-805 (A)(1) prohibits public power entities like SRP from enacting discriminatory rates and considering the profits or losses associated with electric generation service in establishing electric distribution service prices.

99.     In adopting the E-27 rate for solar customers in the Class, SRP both (a)

adopted discriminatory rates and (b) considered the profits or losses associated with electric generation service in establishing electric distribution service prices.

100.   SRP has provided false explanations for its conduct in implementing its discriminatory price plans under the SEPPs.  SRP's pretextual explanations include solar customers are "subsidized" by SRP customers without solar energy systems because the payments solar customers make to SRP do not allow it to recover a sufficient portion of the fixed costs of offering service to those customers.

101.   The ultimate premises of SRP's assertion are unsubstantiated. Rather than forcing additional costs on other customers, solar customers actually benefit SRP and all its customers in numerous ways, including reducing SRP's costs of generating power, distribution and transmission. SRP's own history of supporting, incentivizing, and subsidizing the purchase of solar energy systems demonstrates the benefits received by SRP and its customers.

102.   SRP's justification also conflicts with the basic premise of the antitrust laws. As the United States Supreme Court stated inference to another utility provider that protested antitrust liability, "The [Sherman] Act assumes that an enterprise will protect itself against loss by operating with superior service, lower costs, and improved efficiency." *Otter Tail Power Co. v. U.S.*, 410 U.S. 366, 380 (1973).

103.   SRP inaccurately asserts a supposed right to recover costs it chose to incur, or bad investment decisions it made. Pro-competitive responses to reduced demand include reducing unnecessary "fixed costs" by innovating or operating more efficiently.

104.   By implementing the E-27 price plan, SRP is not preventing a subsidy to solar energy customers; instead it's charging solar customers more money for less service, than other customers with the exact same usage characteristics.  Additionally, SRP is charging solar customers far more than the amount of fixed costs than are attributed to such customers, while charging all other customers a small fraction of the fixed costs attributable to their use of the SRP grid.

26

105.   SRP's argument that it is preventing a "subsidy" is pretextual and is demonstrated by SRP's comfort with the large "cross subsidies" it continues to provide since those subsidies do not arise from solar competition.  For example, under SRP's logic, SRP customers who use natural gas appliances (with gas provided by third parties, not SRP) have less electricity demand from SRP, and any "fixed" costs attributable to them are therefore "subsidized" by others; SRP customers with winter homes in Arizona use far less electricity from SRP, and therefore are "subsidized" by others; SRP's existing customers "subsidize" customers in new homes, for whom SRP has to build out new lines; SRP's more rural customers, who cause SRP higher distribution and transmission costs than metropolitan customers, are "subsidized" by metropolitan customers; and SRP's customers who have taken steps other than installing competitive distributed solar to reduce the amount of electricity they demand from the grid are "subsidized" by those who consume more electricity.

106.   Therefore, under SRP's logic, thousands of SRP's non-solar customers have purchase or demand characteristics that would result in those customers being fairly characterized as receiving "subsidies" by other rate payers. Yet such customers are not called upon to pay the higher rates solar customers are required to pay. It is evident that SRP's price plans are adopted to discriminate among its solar customers with the intent of eliminating solar competition in SRP territory and to increase SRP's revenues at the expense of the group discriminated against – here, Plaintiffs and the Class.

107.   SRP's E-27 plan is discriminatory and all justifications put forth by SRP are objectively unfounded.

## VI.   CLASS ALLEGATIONS

108.   Plaintiffs bring this action individually and on behalf of a class of SRP solar customers pursuant to Rule 23 of the Federal Rules of Civil Procedure.

109.   Plaintiffs allege a class defined as follows:

All individuals in SRP's service territory who during the Class Period have been charged for electricity under the E-27 Customer Generation Price Plan in accordance with SRP's Standard Electric Price Plans (the "Class").

110.   The Class Period starts on the day SRP first implemented the E-27 Customer Generation Price Plan in accordance with SRP's Standard Electric Price Plans, and continues to the present and forward through the date of judgment.

111.   Specifically excluded from the Class are: (a) any officers, directors or employees of Defendants; (b) any judge assigned to hear this case (or spouse or family member of any assigned judge); (c) any employee of the Court; and (d) any juror selected to hear this case. Plaintiffs reserve the right to modify or amend the definition of the proposed Class before the Court determines whether certification is appropriate.

112.   All requisite elements for class certification under Fed. R. Civ. P. 23(a), 23(b)(1), 23(b)(2), and 23(b)(3) are satisfied.  The numerosity, commonality, typicality, superiority, adequacy, and predominance requirements of Rule 23 of the Federal Rules of Civil Procedure are all satisfied.

113.   **Numerosity:** The class is so numerous that joinder of its member is impracticable.  The precise number of members is unknown at this time, but SRP is one of the nation's largest public power utility providers.  SRP provides electricity to approximately 1 million customers within Arizona, if not more.  It is believed that hundreds, if not thousands, of those customers were charged for electricity under the E-27 Customer Generation Price Plan in accordance with SRP's Standard Electric Price Plans.  The precise number of class members can be ascertained by reviewing SRP's customer and billing records.

114.   **Commonality and Predominance**: Common questions of law and fact exist as to all members of the class, and predominate over any questions that affect only individual members of the class.  Common legal and factual questions at issue in this action will generate common answers to resolve this litigation, including the following:

> a.   Whether SRP's E-27 price plan discriminates against solar energy customers in the Class;

b.     Whether SRP maintained or attempts to maintain monopoly power in the relevant market or markets;

c.     Whether SRP's alleged conduct was anticompetitive and exclusionary;

d.     Whether SRP had a rational basis for implementing the discriminatory E-27 price plan;

e.     Whether SRP's alleged conduct violated the federal and state antitrust laws;

f.     Whether SRP's conduct of applying its discriminatory E-27 price plan violates the Equal Protection Clause of the U.S. and the Arizona Constitution;

g.     Whether SRP's alleged conduct violates anti-discrimination provisions of the Arizona Constitution;

h.     Whether Plaintiffs and the Class were harmed and suffer damages as a result of SRP's conduct and, if so, the appropriate amount thereof; and

i.     Whether Plaintiffs and the Class are entitled to, among other things, injunctive relief and if so, the nature and extent of such injunctive relief.

115.   **Typicality:** Plaintiffs' claims are typical of the claims of the members of the Class.  Like all members of the Class, Plaintiffs purchased a solar energy system to self-generate electricity.  Plaintiffs and members of the Class all purchase electricity from SRP when they are unable to generate enough solar energy to power their property.  Plaintiffs and all Class members are subject to SRP's same discriminatory rates causing them common financial injury and damages.  Plaintiffs assert common legal claims that are typical of those of the Class and seek common monetary, injunctive and declaratory relief.

116.   **Adequacy**: Plaintiffs are adequate representatives of the Class because

29

their interests do not conflict with the interests of the members of the Class. Plaintiffs have retained counsel that are competent and experienced in complex class action litigation; and have sufficient resources to prosecute this action vigorously. The interests of the Class will be fairly and adequately be protected by the Plaintiffs and counsel.

117.   **Superiority:** A class action is superior to all other available methods for the fair and efficient adjudication of this controversy because individual litigation of the claims of all Class members is economically infeasible and procedurally impracticable. Individual members of the Class do not have a significant interest in individually controlling the prosecution of separate actions, and individualized litigation presents the potential for inconsistent or contradictory judgments. Absent a class action, the Class would find the cost of litigating their claims prohibitively high and would have no effective remedy. Therefore, a class action presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

118.   A class, as defined above, should also be certified under Fed. R. Civ. P. 23 (b)(2) as all requisite elements of that section are met. SRP has acted or refused to act on grounds generally applicable to the class, making appropriate final injunctive relief or corresponding declaratory relief with respect to the Class on all counts.

119.   A class, as defined above, should also be certified under Fed. R. Civ. P. 23 (b)(1) as all requisite elements of that section are met. Class certifications will avoid inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for the party opposing the Class.

## VII.   CAUSES OF ACTION

### COUNT I
### MONOPOLIZATION IN VIOLATION OF
### THE SHERMAN ANTITRUST ACT (15 U.S.C. § 2)

120.   Plaintiffs incorporate by reference all paragraphs above as if fully set herein.

121.   SRP possesses monopoly power in the relevant market.

122.   SRP willfully maintains a monopoly power by engaging in anticompetitive and exclusionary conduct in violation of Section 2 of the Sherman Antitrust Act, 15 U.S.C. § 2.

123.   SRP engages in willful, anticompetitive and exclusionary conduct through its discriminatory price plans, the SEPPs.  SRP imposes substantial penalties, in the form of its E-27 price plan on solar customers who choose to self-generate electricity with a solar energy system.

124.   By implementing the E-27 pricing plan, SRP is unlawfully monopolizing the relevant market by excluding competition from solar energy systems by making it economically unfeasible for solar customers and solar installers to purchase solar energy systems for use within the relevant market.

125.   SRP's anticompetitive conduct is not a result of superior skill, business acumen, or historic accident.

126.   As a direct and proximate result of SRP's monopoly maintenance, Plaintiffs and the Class have suffered injury and incurred damages in an amount to be proven at trial.

127.   As a direct and proximate result of SRP's monopoly maintenance, Plaintiffs and the Class will continue to suffer damages.  SRP's unlawful maintenance of monopoly will continue if not enjoined.

128.   Based on the foregoing, Plaintiffs and the Class are entitled to and demand monetary, injunctive and declaratory relief.

**COUNT II**
**ATTEMPTED MONOPOLIZATION IN VIOLATION OF**
**THE SHERMAN ANTITRUST ACT (15 U.S.C. § 2)**

129.   Plaintiffs incorporate by reference all paragraphs above as if fully set forth herein.

130.   SRP has engaged in anticompetitive and exclusionary conduct in an attempt to monopolize the relevant market in violation of Section 2 of the Sherman

31

Antitrust Act, 15 U.S.C. § 2.

131.   SRP's implementation of the E-27 pricing plan constitutes an unlawful attempt to monopolize the relevant retail market by excluding competition from solar energy systems.

132.   Through SRP's anticompetitive and exclusionary pricing scheme, there is a dangerous probability that SRP will achieve monopoly power in the relevant market.

133.   As a direct and proximate result of SRP's attempt to monopolize, Plaintiffs and the Class were suffered injury and incurred damages in an amount to be proven at trial.

134.   SRP's attempts to monopolize will likely continue if not enjoined.

135.   Based on the foregoing, Plaintiffs and the Class are entitled to and demand monetary, injunctive and declaratory relief.

**COUNT III**
**MONOPOLY MAINTENANCE IN VIOLATION OF THE**
**ARIZONA UNIFORM STATE ANTITRUST ACT (A.R.S. § 44-1403)**

136.   Plaintiffs incorporate by reference all paragraphs above as if fully set forth herein.

137.   SRP willfully engaged in anticompetitive conduct to maintain its monopoly of trade or commerce within Arizona in violation of § 44-1403.

138.   By implementing the E-27 price plan, SRP's conduct constitutes anticompetitive and unlawful monopoly maintenance in violation of A.R.S. § 44-1403.

139.   SRP possesses monopoly power in the relevant market or markets, and unlawfully maintains it through the adoption of its SEPPs, in particular the E-27 price plan.

140.   SRP's E-27 pricing plan is discriminatory and anticompetitive in nature; this pricing scheme has the purpose and effect of excluding competition from solar energy systems.

141.   SRP's anticompetitive conduct is not justified by valid business reasons or lawful, pro-competitive efficiencies.

32

142.   There is no rational basis for SRP's conduct of adopting discriminatory electricity rates aimed at penalizing Class members who use solar energy systems.

143.   As a direct and proximate result of SRP's monopoly maintenance, Plaintiffs and the Class have suffered injury and incurred damages in an amount to be proven at trial.

144.   SRP's monopoly maintenance is likely to continue and result in the foreclosure of competition in the market, if not enjoined.

145.   Based on the foregoing, Plaintiffs and the Class are entitled to and demand monetary, injunctive and declaratory relief.

**COUNT IV**
**ATTEMPTED MONOPOLIZATION IN VIOLATION OF THE**
**ARIZONA UNIFORM STATE ANTITRUST ACT (A.R.S. § 44-1403)**

146.   Plaintiffs incorporate by reference all paragraphs above as if fully set forth herein.

147.   In the alternative, SRP's implementation of the SEPPs constitutes an unlawful attempt to monopolize trade or commerce within Arizona in violation of § 44-1403.

148.   SRP willfully and intentionally attempted to monopolize trade or commerce within in the relevant market or markets by excluding competition from solar energy systems with its discriminatory pricing scheme, the E-27 price plan.

149.   Through SRP's anticompetitive and exclusionary conduct, there is a dangerous probability that SRP will achieve monopoly power.

150.   As a direct and proximate result of SRP's attempt to monopolize, Plaintiffs and the Class have suffered injury and incurred damages in an amount to be proven at trial.

151.   SRP's unlawful conduct is likely to continue and cause additional damage and loss, if not enjoined.

152.   Based on the foregoing, Plaintiffs and the Class are entitled to and demand monetary, injunctive and declaratory relief.

**COUNT V**
**PRICE DISCRIMINATION IN VIOLATION OF**
**ARITCLE 15, SECTION 12 OF THE ARIZONA CONSTITUTION**

153.    Plaintiffs incorporate by reference all paragraphs above as if fully set forth herein.

154.    With the adoption of the SEPPs, SRP unlawfully discriminates against solar customers for the same service provided to SRP's grandfathered solar customers and its non-solar customers within the State of Arizona.

155.    SRP solar customers rely on SRP for electricity during times when they are unable to self-generate sufficient electricity from their solar energy systems. Similar to SRP's non-solar customers and the grandfathered solar customers, SRP provides the same service to solar customers during the time when they are unable to self-generate electricity.

156.    By charging solar customers a significantly higher rate under the E-27 price plan for the exact same electricity provided to SRP's other customers, SRP is violating Article 15, Section 12 of the Arizona Constitution.

157.    As a direct and proximate result of SRP's discriminatory conduct, Plaintiffs and the Class have suffered injury and incurred damages in an amount to be proven at trial.

158.    SRP's unlawful and unconstitutional conduct is likely to continue and cause additional damage and loss, if not enjoined.

159.    Based on the foregoing, Plaintiffs and the Class are entitled to and demand monetary, injunctive and declaratory relief.

**COUNT VI**
**PRICE DISCRIMINATION IN VIOLATION OF THE**
**ARIZONA REVISED STATUTES (A.R.S. § 40-334)**

160.    Plaintiffs incorporate by reference all paragraphs above as if fully set forth herein.

161.    SRP's SEPPs unreasonably charges solar customers under the E-27 price plan a higher rate for the same provision of electricity as compared to SRP's

34

grandfathered solar customers and non-solar customers.

162.    SRP unlawfully maintains an unreasonable difference as to solar customers under the SEPPs E-27 price plan and its grandfathered solar customers.

163.    SRP penalizes solar customers by charging a significantly higher rate for the same service in violation of the Arizona Revised Statutes § 40-334.

164.    SRP's SEPP is a flagrant violation of the A.R.S. § 40-334. SRP's discriminatory price plans will likely continue if not enjoined.

165.    As a direct and proximate result of SRP's discriminatory price plan, Plaintiffs and the Class have suffered injury and incurred damages in an amount to be proved at trial.

166.    SRP's unlawful conduct is likely to continue and cause additional damage and loss, if not enjoined.

167.    Based on the foregoing, Plaintiffs and the Class are entitled to and demand monetary, injunctive and declaratory relief.

**COUNT VII**
**VIOLATION OF EQUAL PROTECTION**
**PURUSANT TO 42 U.S.C. § 1983**

168.    Plaintiffs incorporate by reference all paragraphs above as if fully set forth herein.

169.    SRP's SEPPs E-27 price plan, on its face and as applied, violates the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution.  Specifically, SRP's E-27 price plan creates three classes of customers: the SRP grandfathered solar customers who are exempt from the E-27 price plan; SRP solar customers that are subject to the higher charges of the E-27 price plan; and SRP non-solar customers who are not charged under the E-27 price plan.

170.    These classifications have a direct bearing on the right to be charged for services equally based on the amount of electricity consumed regardless of whether a customer chooses to supplement their supply of electricity with solar technology.

171.   SRP's E-27 price plan singles out newer solar customers and discriminates against them by charging the penalizing fees associated with the E-27 price plan.

172.   SRP lacks any legitimate state interest justifying the creation of these classes and cannot show that these classifications are necessary to serve any rational interest.

173.   This cause of action can be maintained under the United States Constitution, 42 U.S.C. § 1983, and other applicable law.

174.   As a direct and proximate result of SRP's discriminatory price plan, Plaintiffs and the Class have suffered injury and incurred damages in an amount to be proved at trial.

175.   SRP's unlawful and unconstitutional conduct is likely to continue and cause additional damage and loss, if not enjoined.

176.   Based on the foregoing, Plaintiffs and the Class are entitled to and demand monetary, injunctive and declaratory relief.

**COUNT VIII**
**VIOLATION OF EQUAL PROTECTION**
**PURUSANT TO A.R.S. CONST. ART. 2 § 13**

177.   Plaintiffs incorporate by reference all paragraphs above as if fully set forth herein.

178.   SRP's SEPPs E-27 price plan, on its face and as applied, violates the Equal Protection Clause of the Arizona Constitution.  Specifically, SRP's E-27 price plan creates three classes of customers: the SRP grandfathered solar customers who are exempt from the E-27 price plan; SRP solar customers that are subject to the higher charges of the E-27 price plan; and SRP non-solar customers who are not charged under the E-27 price plan.

179.   These classifications have a direct impact on the right to be charged for services equally based on the amount of electricity consumed regardless of whether a customer chooses to supplement their supply of electricity with solar technology.

36

180.    SRP's E-27 price plan singles out newer solar customers and discriminates against them by charging the penalizing fees associated with the E-27 price plan. SRP lacks any legitimate state interest justifying the creation of these classes and cannot show that these classifications are necessary to serve any rational interest.

181.    As a direct and proximate result of SRP's discriminatory price plan, Plaintiffs and the Class have suffered injury and incurred damages in an amount to be proved at trial.

182.    SRP's unlawful and unconstitutional conduct is likely to continue and cause additional damage and loss, if not enjoined.

183.    Based on the foregoing, Plaintiffs and the Class are entitled to and demand monetary, injunctive and declaratory relief.

**COUNT IX**
**VIOLATION OF A.R.S. 44-1522 *et seq*.**

184.    Plaintiffs incorporate by reference all paragraphs above as if fully set forth herein.

185.    The foregoing business practices and conduct of Defendant are unlawful, abusive and unfair.

186.    A.R.S. § 30-806(D) provides: "Failure of a public power entity to comply with the rules adopted pursuant to subsections A and B of this section or the procedures listed in subsection D of this section is an unlawful practice pursuant to § 44-1522."

187.    A.R.S. § 30-806(A) provides, in part, "Public power entities shall adopt rules and procedures to protect the public against deceptive, unfair and abusive business practices. Public power entities and the commission shall coordinate their respective rules and procedures to promote consistent implementation statewide. The rules and procedures adopted by public power entities shall address at least:  1. Deceptive, unfair and abusive business practices…."

188.    SRP failed to comply with A.R.S. § 30-806. SRP failed to adopt rules and procedures to protect the public against deceptive, unfair and abusive business

37

practices.  Instead, by its above-described conduct, SRP engaged in deceptive, unfair and abusive business practices.

189.   A.R.S. § 44-1522 (A) provides: "The act, use or employment by any person of any deception, deceptive or unfair act or practice, fraud, false pretense, false promise, misrepresentation, or concealment, suppression or omission of any material fact with intent that others rely on such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise whether or not any person has in fact been misled, deceived or damaged thereby, is declared to be an unlawful practice."

190.   SRP's conduct violates A.R.S. § 30-806 and A.R.S. § 44-1522 *et seq*.

191.   As a direct and proximate result of SRP's discriminatory price plan and unfair and abusive practices and conduct, described above, Plaintiffs and the Class have suffered injury and incurred damages in an amount to be proved at trial.

192.   SRP's unlawful conduct is likely to continue and cause additional damage and loss, if not enjoined.

193.   Based on the foregoing, Plaintiffs and the Class are entitled to and demand monetary, injunctive and declaratory relief.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, individually and on behalf of the Class, respectfully request that the Court award the following on all counts:

A.   Damages sufficient for Plaintiffs and the Class to be made whole;

B.   Certification of the Class as defined pursuant to Fed. R. Civ. P. 23;

C.   Appointment of Plaintiffs as Class Representatives and its undersigned counsel as Class Counsel pursuant to Fed. R. Civ. P. 23(a)(4) and 23(g);

D.   Compensatory and actual damages in an amount as determined at trial, including pre- and post- judgment interest;

E.   Treble damages on all counts where such relief is appropriate and permissible by law;

F.      Award Plaintiffs and the class reasonable attorneys' fees and costs as allowable by law;

G.      Grant injunctive and equitable relief sufficient to require Defendant to terminate its discriminatory and anticompetitive conduct;

H.      Declare Defendant's conduct unconstitutional and a violation of the laws set forth above;

I.      Grant such other and further relief as the Court deems just and proper and to which Plaintiffs and the Class may be entitled.

## DEMAND FOR JURY TRIAL

Plaintiffs, individually and on behalf of the Class, demand a trial by jury on all issues so triable.

Dated: February 22, 2019                          Respectfully submitted,

                                                  **ZIMMERMAN REED LLP**


                                                  By: s/ Hart L. Robinovitch
                                                      Hart L. Robinovitch (AZ SBN 020910)
                                                      14646 North Kierland Blvd., Suite 145
                                                      Scottsdale, AZ  85254
                                                      Telephone: (480) 348-6400
                                                      Facsimile: (480) 348-6415
                                                      Email: hart.robinovitch@zimmreed.com


                                                      **ZIMMERMAN REED LLP**
                                                      David M. Cialkowski
                                                      (*pro hac vice to be filed*)
                                                      Alia M. Abdi (*pro hac vice to be filed*)
                                                      1100 IDS Center
                                                      80 South Eighth Street
                                                      Minneapolis, MN 55402
                                                      Telephone: (612) 341-0400
                                                      Facsimile: (612) 341-0844
                                                      Email: david.cialkowski@zimmreed.com
                                                      Email: alia.abdi@zimmreed.com

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**GUSTAFSON GLUEK PLLC**
Daniel E. Gustafson
(*pro hac vice to be filed*)
Daniel C. Hedlund
(*pro hac vice to be filed*)
Daniel J. Nordin (*pro hac vice to be filed*)
Canadian Pacific Plaza
120 South Street, Suite 2600
Minneapolis, MN  55402
Telephone: (612) 333-8844
Facsimile: (612) 339-6622
Email: dgustafson@gustafsongluek.com
Email: dheldund@gustafsongluek.com
Email: dnordin@gustafsongluek.com

*Attorneys for Plaintiffs*