**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| William Ellis, et al., | No. CV-19-01228-PHX-SMB |
| Plaintiffs, | **ORDER** |
| v. | |
| Salt River Project Agricultural Improvement and Power District, | |
| Defendant. | |

Before the Court are Defendant Salt River Project Agricultural Improvement and Power District's ("District") Motion to Dismiss and Request for Judicial Notice.[1] (Doc. 14, "Mot."; Doc. 15, "Req."). Plaintiff customers William Ellis, Robert Dill, Edward Rupprecht, and Robert Gustavis responded to the Motion and the District replied. (Doc. 21, "Resp."; Doc. 22, "Repl."). Plaintiffs also responded to the Request. (Doc. 20, "R.Resp."). The Court heard oral argument November 18, 2019. (Doc. 28.) Accepting the allegations as true, the Motion and Request are each granted in part as explained below.

## I.      BACKGROUND

This case arises out of the District's adoption of a new rate structure for its sale of electricity, which includes additional fees and different rates for residential customers, like Plaintiffs, who self-generate some of their electricity through solar energy systems. (Doc. 12, "FAC" ¶¶ 6, 28, 75-76.) In 2014, the District proposed the new rate structure ("Standard

---

[1] The District's Memorandum in Support of its Motion is docketed separately. (*See* Doc. 14-1, "Memo.")

Electric Price Plans" or "SEPPs"), which includes a new E-27 price plan required for self-generating solar customers, that its Board of Directors ("Board") approved in 2015. (*Id.* ¶¶ 72-73.) The E-27 price plan applies to customers who began self-generating solar power after December 8, 2014. (*Id.* ¶ 81.) Plaintiffs' claims relate to their financial injuries caused by the SEPPs. (*Id.* ¶¶ 1, 5, 73.)

### A. **Parties**

Plaintiffs are four District residential customers who live in Arizona and self-generate some of their electricity through personal solar energy systems. (*Id.* ¶¶ 20-27.) Three Plaintiffs installed their solar energy systems after the District adopted the SEPPs. (*Id.* ¶¶ 21, 23, 25.) Specifically, Ellis, Dill, and Rupprecht installed solar energy systems in May 2018, July 2018, and November 2016, respectively. (*Id.*) Rupprecht bought his home equipped with a solar energy system at an unknown date. (*Id.* ¶ 27.)

The District and the "Association" are two distinct entities comprising the Salt River Project Agricultural Improvement and Power District ("SRP"), a power-and-water utility company in central Phoenix, Arizona.[2] (*Id.* ¶ 28.) Although the District is a political subdivision of Arizona, it (1) "is not recognized by the State of Arizona or by any law as a regulator or regulatory authority in the retail [electricity] market;" (2) "cannot impose ad valorem property taxes or sales taxes or enact laws governing citizens' conduct;" (3) "cannot administer normal governmental functions such as the maintenance of streets, the operation of schools, or sanitation, health or welfare services;" (4) "is not exempt from a city's exercise of eminent domain, nor it is immune from tort liability;" and (5) can only levy taxes against its landowners. (*Id.* ¶¶ 35-36.) Unlike other utility providers, the District's rates, rules, and regulations are exempt from the control of Arizona's public utility regulator, the Arizona Corporation Commission ("ACC"). (*Id.* ¶ 37.)

### B. **The Retail Electricity Market**

The District provides electricity to around two million residential and commercial

---

[2] The Association formed the District as a "political subdivision of the State of Arizona" in 1937 "for the purpose of refinancing the Association's debt by issuing interest-free municipal bonds." (*Id.* ¶¶ 28, 30, 35.)

customers including Plaintiffs in central Phoenix ("Market"). (*Id.* ¶¶ 2, 28, 32, 42.) As Plaintiffs allege, the District provides over 95% of retail customers' electricity in the Market through a variety of plans and sources. (*Id.* ¶¶ 48-49.) Individuals in the Market can either purchase electricity from the District or self-generate electricity through purchased or leased solar energy systems. (*Id.* ¶ 43.) By investing in solar energy systems, customers "significantly reduce the amount of electricity that they need to purchase from [the District]." (*Id.* ¶ 44.) However, "[s]ince technologies that would allow consumers to completely remain off the grid are not yet economically viable," "all customers within [the Market] generally must purchase some retail electricity from [the District]." (*Id.* ¶ 52.) The District competes with solar energy system installers in the Market to provide electricity and one of its executives allegedly referred to solar energy systems, installers, and advocates as 'the enemy.'" (*Id.* ¶¶ 44-45.)

The District's monopolization is allegedly not caused by any state policy to prevent competition, especially since Arizona's legislature encouraged competition in the retail electricity market through the Electric Power Competition Act of 1998 ("the Act"). (*Id.* ¶¶ 53-54.) The District acknowledges the legislature's transition to promote competition in the Market in its 2010 rules and regulations, which state "[the District's] service territory is open to competition . . . in accordance with the . . . Act." (*Id.* ¶ 55.) The Act also allegedly subjects public power entities to antitrust liability. (*Id.* ¶ 59 (citing A.R.S. § 30-813)).

## C. **Dispute**

The SEPPs are "aimed at maintaining [the District's] monopoly power; impeding solar development despite its recognized benefits; quashing competition for electricity from self-generating customers with solar energy systems; and generating additional revenues for [the District] through exploitation of its monopoly power." (*Id.*) More explicitly, the SEPPs make self-generating solar energy uneconomical and force Market consumers to exclusively purchase the District's electricity. (*Id.* ¶ 87.) Because the District previously encouraged and even incentivized consumer investment in solar energy systems until 2014, (*id.* ¶¶ 63, 71-72), Plaintiffs claim the District adopted and advertised the SEPPs

1    to deter individuals from investing in solar energy systems and fortify its monopoly. (*Id.*
2    ¶¶ 5-10, 46, 71-72, 84.)

3        The SEPPs differentiate between three types of customers. (*Id.* ¶ 81.) The first
4    category is non-solar customers, who purchase all of their electricity from the District,
5    follow the traditional rate structure, and pay per kilowatt-hour of electric usage, a $20.00
6    monthly service charge, and a $4.20 distribution charge. (*Id.* ¶¶ 74-75.) The second
7    category is solar-customers, like Plaintiffs, who began self-generating solar energy after
8    2014 ("post-2014 solar customers"). (*Id.* ¶ 80.) Post-2014 solar-customers are subject to
9    the E-27 plan, which is a "demand based rate plan" that includes a $32.44 or $45.44
10   monthly service charge, $16.64 or $29.64 distribution charge, and additional "demand
11   charge" that is not applied to non-solar customers. (*Id.* ¶¶ 75-76.) The District charges post-
12   2014 solar customers roughly $600 more per year than other customers. (*Id.* ¶ 89.) The
13   third category is solar-customers who self-generated solar energy before December 8, 2014
14   ("pre-2014 solar customers"). (*Id.* ¶ 81.) Pre-2014 solar customers are exempt from the E-
15   27 plan and treated like non-solar customers. (*Id.*)

16       Plaintiffs allege the SEPPs "made it economically unfeasible for customers to install
17   solar energy systems." (*Id.* ¶ 92.) Plaintiffs further allege "[t]here is no rational basis" for
18   adopting the SEPPs and the District's reason of recouping fixed expenses required to
19   service post-2014 solar customers is pretextual. (*Id.* ¶¶ 96, 100.) Beyond "public policy
20   and logic" warranting relief, Plaintiffs claim the District's "anticompetitive,
21   discriminatory, and unconstitutional conduct" warrants "monetary, injunctive, and
22   declaratory relief" under a variety of federal, state, and constitutional remedies. (*Id.* ¶ 1.)
23   Plaintiffs allege the SEPPs violate (1) federal and state antitrust law; (2) state-law price
24   discrimination; (3) federal and state equal protection; and (4) Arizona's Consumer Fraud
25   Act. (*Id.* ¶¶ 120-195.) The District requests judicial notice and moves to dismiss under
26   Federal Rule of Civil Procedure 12(b)(6). The Court begins with the District's Request.

27   **II.    REQUEST FOR JUDICIAL NOTICE**

28       When a complaint is challenged under Rule 12(b)(6), "[r]eview is limited to the

complaint." *Cervantes v. City of San Diego*, 5 F.3d 1273, 1274 (9th Cir. 1993). However, courts may "consider certain [other] materials—documents attached to the complaint, documents *incorporated by reference* in the complaint, or matters of *judicial notice*— without converting the motion to dismiss into a motion for summary judgment." *United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003) (emphasis added).

Under the incorporation-by-reference doctrine, a court may consider "certain documents as though they are part of the complaint itself," *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1002 (9th Cir. 2018), "if the plaintiff refers extensively to the document or the document forms the basis of the plaintiff's claim[s]." *Ritchie*, 342 F.3d at 907. "The doctrine prevents plaintiffs from selecting only portions of documents that support their claims, while omitting portions of those very documents that weaken—or doom—their claims." *Khoja*, 899 F.3d at 1002 (citing *Parrino v. FHP, Inc.*, 146 F.3d 699, 706 (9th Cir. 1998), superseded by statute on other grounds as recognized in *Abrego Abrego v. Dow Chem. Co.*, 443 F.3d 676, 681-82 (9th Cir. 2006)). But "if the document merely creates a defense to the well-pled allegations in the complaint, then that document did not necessarily form the basis of the complaint." *Khoja*, 899 F.3d at 1002.

Additionally, a court may also consider certain documents satisfying Federal Rule of Evidence 201. Under Rule 201, a court may judicially notice a fact "not subject to reasonable dispute because it (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Ev. 201(b). "A court may take judicial notice of matters of public record." *Khoja*, 899 F.3d at 999. But "[j]ust because the document itself is susceptible to judicial notice does not mean that every assertion of fact within that document is judicially noticeable for its truth." *Id.* In cautioning against taking judicial notice, Rule 201's advisory committee notes emphasize that "taking evidence, subject to cross-examination and rebuttal, is the best way to resolve controversies involving disputes of adjudicative facts, that is, facts pertaining to the parties." Fed. R. Ev. 201. Dispensing with these traditional methods should only be done so in clear cases of "[a] high degree of

indisputability." *Rivera v. Philip Morris, Inc.*, 395 F.3d 1142, 1151 (9th Cir. 2005) (citing Fed. R. Ev. 201). Here, the District requests consideration of ten exhibits under the incorporation-by-reference doctrine and Rule 201. (Req. at 4.)

### A. Notice of Claims (Exhibit 1)

Exhibit 1 is Plaintiffs' notice of claims pursuant to A.R.S. § 12-821.01. (Doc. 15-2 at 2-45, "Notice.") The District requests the Court judicially notice it because its deficiencies compel dismissal of Plaintiffs' state law claims. (Req. at 5.) Plaintiffs claim the request should be denied because "Arizona's notice of claim requirement is procedural [and] does not apply in federal court." (R.Resp. at 3.) Alternatively, Plaintiffs do not object if the notice of claim requirement applies. (*Id.*) Plaintiffs' Notice applies in federal court. *See Mothershed v. Thomson*, No. CV-04-2266-PHX-JAT, 2006 WL 381679, *7 (D. Ariz. Feb. 16, 2006) ("federal courts entertaining state-law claims against state entities are obligated to apply the state law notice-of-claim provision"); *see also Payne v. Arpaio*, No. CV-09-1195-PHX-NVW, 2009 WL 3756679, *11 (D. Ariz. Nov. 4, 2009) ("§ 12-821.01 applies to all state law claims."). Accordingly, the Court judicially notices Exhibit 1.

### B. Arizona Corporation Commission Staff Report; 2013 Docket Request; 2018 Docket Request (Exhibits 2-4)

Exhibit 2 is a 2010 ACC internal memorandum containing an attachment titled "staff report for generic proceedings concerning electric restructuring issues." (Doc. 15-2 at 47-77, "Staff Report.") Exhibit 3 is a 2013 ACC internal memorandum docket opening request related to the ACC's "inquiry into retail electric commission." (*Id.* at 79, "2013 Docket Request.") Exhibit 4 is a 2018 ACC internal memorandum docket opening request for "possible modifications to the [ACC's] energy rules" related to at least fourteen different energy and energy-related topics. (*Id.* at 81-85, "2018 Docket Request.") The District argues judicial notice is appropriate because Exhibits 2-4 are "public records that directly implicate Plaintiffs' federal and state antitrust [claims] [sic] regarding the Arizona Legislature's intent regarding competition" and relate to the District's state-action immunity defense. (Req. at 5.) The District also cites a case that previously took notice of

ACC documents. (*Id.* (citing *Robinson v. Heritage Elementary Sch.*, No. CV-09-0541-PHX-LOA, 2009 WL 1578313, at *1 n. 3 (D. Ariz. June 3, 2009)). Plaintiffs argue judicial notice is inappropriate for each Exhibit. They argue the Staff Report was "created as part of proceedings that do not apply to the parties in this case, and contains hearsay and non-expert opinions." (R.Resp. at 6.) Second, they argue the 2013 and 2018 Docket Requests "lack any substance and only reflect the opening of a regulatory docket."[3] (*Id.*) Plaintiffs also cite a court order from this District *not* judicially noticing an ACC staff report and administrative memoranda. (*Id.* at 5) (citing *SolarCity Corp. v. Salt River Project Agric. Improvement & Power Dist.*, No. CV-15-00374-PHX-DLR, 2015 WL 6503439, at *3 (D. Ariz. Oct. 27, 2015)). In general, Plaintiffs dispute the District's characterization of what each Exhibit represents." (R.Resp. at 7.) Considering these Exhibits is inappropriate as they are reasonably disputed by the parties.

**C. 2014 Price Proposal Notice; Proposed SEPP Adjustments; Executive Summary; 2018 Price Proposal Notice; Third-Party Report (Exhibits 5-9)**

Exhibit 5 is a 2014 self-created SRP price proposal notice. (Doc. 15-2 at 87-88, "2014 Price Proposal Notice.") Exhibit 6 is a 2014 self-created SRP report titled "Proposed Adjustments to SRP's [SEPPs] Effective with the April 2015 Billing Cycle." (*Id.* at 90-276, "Proposed SEPP Adjustments.") Exhibit 7 is a 2015 self-created SRP executive summary related to SRP's price proposal. (Doc. 15-3 at 2-13, "Executive Summary.") Exhibit 8 is a 2018 self-created SRP pricing proposal notice. (*Id.* at 15-16, "2018 Price Proposal Notice.") Exhibit 9 is a 2014 report prepared by Sussex Economic Advisors titled "Review of Proposed Adjustments to [SRP's SEPPs]." (*Id.* at 18-114, "Third-Party Report.") The District requests judicial notice that Exhibits 5-9 "were part of the record during the public ratemaking proceeding." (Req. at 6.). It argues these self-created "public documents . . . have procedural significance to the ratemaking proceeding" and "directly relate to Plaintiffs' allegations regarding the District's justifications for adopting the challenged E-27 rate." (*Id.*) Plaintiffs again dispute the truth of the matters asserted in these

---

[3] Plaintiffs alternatively do not object to judicially noticing Exhibits 3 and 4 for the assertion that the ACC opened a docket in 2013 and 2018 respectively. (*Id.*)

documents, particularly because SRP created these documents and the District has "cherry-picked" them from the ratemaking proceeding. (R.Resp. at 7-9.) Exhibits 5-8 are self-created documents, Exhibit 9 is a third-party report, and each Exhibit is reasonably disputed. Even noticing them for the fact that they were "part of the record during the public ratemaking proceeding" is improper because, as Plaintiffs assert, these documents are not the complete record. Accordingly, judicial notice is inappropriate here.

### D. **Auditor General Report (Exhibit 10)**

Exhibit 10 is a 2008 Arizona Auditor General Office report: "Review of Arizona Revised Statutes (A.R.S.) §§30-806(l), and 40-202(B)(3) and (5) related to electric competition." (Doc. 15-3 116-120, "Auditor General Report.") The District argues judicial notice is appropriate because the Auditor General Report "is (1) a public record prepared in the official capacity of the Auditor General at the direction of the legislature, (2) directly relates to Plaintiffs' allegations and the District's defenses, (3) is publicly available through the Auditor General's website, and (4) is not subject to reasonable dispute." (Req. at 7-8.) Plaintiffs argue judicial notice is inappropriate because the Auditor General Report "does not directly relate to the matters at issue, and because the truth of the matters asserted [(the status of electric competition)] is disputed." (R.Resp. at 3, 8.) Because the status of electric competition is at issue, judicially noticing a document on the topic is inappropriate.

Review of each Exhibit (except Exhibit 1) under the incorporation-by-reference doctrine and Rule 201 reveals their consideration at this stage is inappropriate. For the most part, the Exhibits "merely create[] a defense" for the District. *Khoja,* 899 F.3d at 1002. Further, they lack Rule 201's "high degree of indisputability," *Rivera*, 395 F.3d at 1151, necessary to dispense with the traditional methods of introducing evidence at trial. Notably, we are currently at the motion to dismiss stage. Accordingly, the Court only judicially notices Exhibit 1.

### III.   **LEGAL STANDARD**

When analyzing a complaint under Rule 12(b)(6), well-pled factual allegations are presumed true and construed in the light most favorable to the nonmoving party. *Cousins*

*v. Lockyer*, 568 F.3d 1063, 1067 (9th Cir. 2009). Dismissal under Rule 12(b)(6) "can be based on the lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory." *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1988). To survive a Rule 12(b)(6) motion to dismiss for failure to state a claim, a complaint must meet Rule 8(a)(2)'s minimum requirements. Rule 8(a)(2) requires a "short and plain statement of the claim showing that the pleader is entitled to relief," so that the defendant has "fair notice of what the . . . claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). A complaint setting forth a cognizable legal theory will survive a motion to dismiss if it contains sufficient factual matter stating a claim to relief that is "plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). Facial plausibility only exists if the pleader sets forth "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* Plausibility does not equal "probability," but instead requires "more than a sheer possibility that a defendant has acted unlawfully." *Id.* "Where a complaint pleads facts that are 'merely consistent' with a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" *Id.* (quoting *Twombly*, 550 U.S. at 557).

## IV.   DISCUSSION

The FAC alleges nine causes of action against the District. (FAC ¶¶ 120-195.) These include: (1) monopolization and attempted monopolization in violation of the Sherman Antitrust Act and the Arizona Uniform State Antitrust Act ("AUSAA"); (2) price discrimination in violation of Arizona's constitution and statutes; (3) violation of equal protection under 42 U.S.C. § 1983 and Arizona's constitution; and (4) violation of Arizona's Consumer Fraud Act. (*Id.*) Plaintiffs request compensatory damages, class certification, appointment as class representatives and class counsel, treble damages, attorney fees, injunctive relief, and declaratory relief. (*Id.*)

The District moves to dismiss primarily on seven grounds: (A) the action is barred as an improper collateral attack on retail electricity rates; (B) state-action immunity bars the antitrust claims; (C) the equal protection claims are untimely; (D) Arizona's Actions Against Public Entities and Public Employees Act bars the state-law claims; (E) state law bars Plaintiffs' state antitrust claims; (F) the Local Government Antitrust Act ("LGAA") and Arizona statutory immunity bar damages against the District; and (G) the FAC fails to state a claim. (Memo. at 15-16.) The Court begins with the District's defenses before discussing the FAC's sufficiency.

## V.     THE DISTRICT'S DEFENSES

As further explained below, this action is not barred as an improper collateral attack under the federal or state filed-rate doctrines, nor does state-action immunity bar Plaintiffs' antitrust claims. Further, Plaintiffs' state law claims are barred under A.R.S. § 12-821 and § 12-821.01 and their Fourteenth Amendment equal protection claims are untimely. Lastly, the LGAA bars Plaintiffs' potential entitlement to antitrust damages arising out of their remaining federal antitrust claims. After the District's defenses, only Plaintiffs' two federal antitrust claims remain.

### A.  **Plaintiffs' Action is Not an Improper Collateral Attack.**

The District asserts the filed-rate doctrine bars Plaintiffs' action.[4] (Memo. at 21.) Relatedly, it claims A.R.S. §§ 30-810 – 812 effectively codifies the filed-rate doctrine in Arizona and alternatively bars Plaintiffs' state-law claims. (*Id*. at 23.) The Court finds neither argument persuasive at this stage.

#### 1.  The Filed-Rate Doctrine is Inapplicable.

"In short, the federal filed rate doctrine applies when federal statutes create a federal regulatory scheme for setting federal rates." *Castillo v. Johnson*, No. CV-17-04688-PHX-DLR, 2019 WL 4222289, *3 (D. Ariz. Sept. 5, 2019). The filed-rate doctrine "precludes interference with the rate setting authority of an administrative agency." *SolarCity Corp.*,

---

[4] The District distinguishes, albeit in a footnote, the federal and state filed-rate doctrines. (*See* Memo. at 22 n.10) ("Arizona has effectively adopted the filed rate doctrine legislatively.")

2015 WL 6503439, at *14 (quoting *Wah Chang v. Duke Energy Trading & Mktg.*, 507 F.3d 1222, 1225 (9th Cir. 2007)). In particular, the doctrine insulates a federal regulatory agency's reasonable rates from challenge. *Id.* (citing *Ark. La. Gas Co. v. Hall*, 453 U.S. 571, 577 (1981)). The doctrine "applies with equal force to challenges brought 'under state law and federal antitrust laws to rates set by *federal agencies*." *E. & J. Gallo Winery v. EnCana Corp.*, 503 F.3d 1027, 1033 (9th Cir. 2007) (emphasis added). "To permit recovery under state law would allow a state court (or a federal court applying state law) to undermine the authority of a federal agency[.]" *Cty. Of Stanislaus v. Pacific Gas and Elec. Co.*, 114 F.3d 858, 863 (9th Cir. 1997) (citing *Ark. La. Gas Co.*, 453 U.S. at 582).

In addition to shielding federal agencies, some states, *excluding* Arizona, apply the filed-rate doctrine to state agencies. *SolarCity Corp.*, 2015 WL 6503439, at *14 (citing *Qwest Corp. v. Kelly*, 59 P.3d 789, 800 (Ariz. Ct. App. 2002)); *see also Johnson v. First Am. Title Ins. CO.*, No. CV-08-01184-PHX-DGC, 2008 WL 4850198, at *4 (D. Ariz. 2008) (Arizona "has never adopted the filed-rate doctrine"). "Arizona courts have not expressly adopted the filed rate doctrine." *Castillo*, 2019 WL 4222289, *4; *see Id.* at 4-6 (exhaustively discussing how Arizona has *not* adopted the filed-rate doctrine). "When state-law regulatory authority provides the basis of the filed rate doctrine, the doctrine should be based on a careful analysis of the text and purpose of the underlying state law, rather than blanket application of the filed rate doctrine to all challenges which touch a regulated industry." *Perryman v. Litton Loan Servicing, LP,* No. 14-CV-221-JST, 2014 WL 4954674, at *6 n.4 (N.D. Cal. Oct. 1, 2014).

The District claims the filed-rate doctrine entirely bars Plaintiffs' lawsuit because each claim "in some way collaterally attacks the E-27 rate on the ground that the rate is too high, discriminatory, or unreasonable." (Memo. at 21.) Plaintiffs claim the doctrine is inapplicable because (1) "[the District] does not file rates with a regulatory agency tasked with determining their reasonableness nor is it a 'regulatory agency' of the type that may implicate the doctrine"; (2) "Arizona has 'never adopted the filed-rate doctrine'"; and (3) "even if Arizona recognized the filed-rate doctrine, [it] is not implicated in this case

because Plaintiffs do not challenge the reasonableness [sic] of [the District's] E-27 rates." (Resp. at 15-16). The District acknowledges Arizona has not adopted the filed-rate doctrine for its state agencies, but requests the Court apply it anyway.[5] (Repl. at 12.) The District also acknowledges the doctrine prevents courts from usurping functions assigned to a *federal regulatory body*. (*Id*. at 10.) The Court finds the filed-rate doctrine inapplicable here.

The filed-rate doctrine is inapplicable for three main reasons. First, it generally protects rates supervised by *federal* regulatory agencies, such as the Federal Energy Regulatory Commission. *See Cty. of Stanislaus*, 114 F.3d at 863. There are no allegations that a federal or state agency directly oversees the District's rate setting. Instead, and to the contrary, the FAC alleges the District is exempt from even the ACC's regulatory authority in Arizona. (FAC ¶ 37.) Second, as both parties agree, Arizona has not adopted the filed-rate doctrine to insulate its state agencies' ratemaking authority. *See Johnson*, 2008 WL 4850198, at *4 (Arizona "has never adopted the filed-rate doctrine"). Regardless of why Arizona has not adopted this doctrine, the Court declines to adopt it on Arizona's behalf. Third, Plaintiffs' claims do not "necessarily hinge on a claim that the . . . approved rate was too high and would, therefore, undermine [ratemaking] authority through the medium of direct court actions," *Wah Chang*, 507 F.3d at 1226. To be sure, Plaintiffs do not challenge the rate as being too high or too low. Nor do they seek Court assistance recalculating the District's precise electricity rates, which is what the filed-rate doctrine seeks to eliminate. Instead, Plaintiffs' allegations appear to be challenging *how* the District treats its solar generating customers, not *at what rate* they are being charged. Thus, dismissal under this doctrine is inappropriate here.

### 2.  A.R.S. §§ 30-810 – 812 Poses No Bar to Plaintiffs' State-Law Claims.

The District next claims Arizona's legislature codified the filed-rate doctrine's underlying principles by barring collateral attacks under Arizona law on the Board's

---

[5] The District acknowledges this by speculating about why Arizona has not adopted the filed-rate doctrine in arguing that the "issue likely remains unresolved in Arizona courts because state law independently forecloses collateral attacks on filed rates." (Repl. at 12.)

ratemaking decisions. (Memo. at 23 (citing A.R.S. §§ 30-810 – 812)). In particular, the District claims section 30-810(B) bars Plaintiffs' state law claims.[6] (*Id*.) That section states: "[n]o claim . . . shall accrue in any court to any party or the state *unless the party* or the state makes, before the effective date of the order or decision, application to the governing body of the public power entity for a rehearing." A.R.S. §§ 30-810(B) (emphasis added). Only a "party to the [underlying] action or proceeding . . . may apply for a rehearing." A.R.S. § 30-810(A). Plaintiffs claim exemption from this procedure because they were not a "party to the action or proceeding" since they installed solar panels *after* the E-27 rates were adopted and therefore could not apply for rehearing. (Resp. at 16-17.) Plaintiffs also claim they were not a "party" to the proceeding because they did not register as one with the District. (*Id*. at 18.)

As an initial matter, the Court refuses to resolve the factual question of whether each Plaintiff was a "party to the action or proceeding" at this stage. Moreover, in addition to the notion that Arizona courts have not yet adopted the filed-rate doctrine to insulate its state regulatory agencies, the Court refuses to find, as the District requests, that this statutory scheme codifies the Arizona legislature's intent to adopt the filed-rate doctrine for *every* state law claim brought against the District in the retail electricity market. *See Castillo*, 2019 WL 4222289, at *5 (Even "assuming Arizona has adopted a form of the doctrine, it is unclear whether it would apply to the type of conduct at issue here."). Even assuming the filed-rate doctrine exists under Arizona law because of the cited statutory scheme, the District fails to show how any single state law claim is barred by it, let alone all of Plaintiffs' state law claims. Accordingly, the District has failed to show how this statutory scheme bars Plaintiffs' state law claims.

In conclusion, the federal filed-rate doctrine is inapplicable to this case. Additionally, the District has failed to show how A.R.S. §§ 30-810 – 812 is a disguised attempt by the Arizona legislature at adopting the filed-rate doctrine to insulate Arizona agencies or how determining whether Plaintiffs were a "party" is not a factual question.

---

[6] The District cites only A.R.S. § 30-810(A), but it appears it is also citing A.R.S. § 30-810(B).

1    Accordingly, neither defense is persuasive at this stage.

2         **B.  <u>State-Action Immunity is Inapplicable.</u>**

3         Every state action immunity analysis begins with *Parker v. Brown,* 317 U.S. 341,

4    350-51 (1943). *Town of Hallie v. City of Eau Claire*, 471 U.S. 34, 38 (1985) (citing *Parker*,

5    317 U.S. at 350-51. In *Parker*, the Supreme Court "refused to construe the Sherman Act as

6    applying to the anticompetitive conduct of a State acting through its legislature." *Hallie*,

7    471 U.S. at 38 (citing *Parker*, 317 U.S. at 350-51). "State-action immunity is the exception

8    rather than the rule." *Chamber of Commerce of the United States of Am. v. City of Seattle*,

9    890 F.3d 769, 781 (9th Cir. 2018). If applicable, state-action immunity bars antitrust claims

10   against qualifying entities. *Cost Mgmt. Servs. Inc. v. Wash. Nat. Gas Co.*, 99 F.3d 937, 943

11   (9th Cir. 1996) (federal antitrust claims); *Mothershed v. Justices of the Sup. Ct.*, 410 F.3d

12   602, 609 (9th Cir. 2005) (Arizona antitrust claims).

13        "[W]hen the entity responsible . . . is a literal arm of the state[,] the doctrine's

14   applicability is obvious." *Dakota Territory Tours ACC v. Sedona-Oak Creek Airport Auth.*

15   *Inc.*, 383 F. Supp. 3d 885, 896-97 (D. Ariz. Apr. 10, 2019) (citation omitted). However,

16   "state-action immunity is all the more exacting when . . . the activity at issue is not directly

17   that of the State itself, but rather is carried out by others pursuant to state authorization."

18   *City of Seattle*, 890 F.3d at 781 (citing *F.T.C. v. Phoebe Putney Health Sys., Inc.*, 568 U.S.

19   216, 225 (2013) (quotation and citation omitted)). In *Cal. Retail Liquor Dealers Ass'n v.*

20   *Midcal Aluminum, Inc.*, 445 U.S. 97, 105 (1980), the Supreme Court articulated a "two-

21   part test applicable to instances where private parties participate in a price-fixing regime."

22   *F.T.C. v. Ticor Title Ins. Co.*, 504 U.S. 621, 633 (1992) (citing *Midcal Aluminum, Inc.*, 445

23   U.S. at 105). Under *Midcal*, "[a] state law or regulatory scheme cannot be the basis for

24   antitrust immunity unless, first the State has articulated a clear and affirmative policy to

25   allow the anticompetitive conduct,[7] and second, the State provides active supervision of

---

26   [7] Under *Midcal*'s first factor, "a state legislature need not 'expressly state in a statute or its
27   legislative history that the legislature intends for the delegated action to have
     anticompetitive effects.'" *Dakota Territory Tours ACC*, 383 F. Supp. 3d at 897. (citing
28   *Hallie*, 471 U.S. at 43). Rather, this factor is met where anticompetitive effects are "the
     foreseeable result of what the statute authorizes." *City of Columbia v. Omni Outdoor*
     *Advert., Inc.*, 499 U.S. 365, 372-73 (1991).

anticompetitive conduct undertaken by private actors." *Ticor*, 504 U.S. at 631 (1992) (citing *Midcal Aluminum, Inc.*, 445 U.S. at 105). However, "[l]ocal government entities, 'unlike private parties, . . . are not subject to the 'active state supervision requirement' because they have less of an incentive to pursue their own self-interest under the guise of implementing state policies." *Phoebe Putney Health Sys.*¸ 568 U.S. at 226 (citing *Hallie*, 471 U.S. at 46-47). But "the need for supervision turns not on the formal designation given by States to regulators but on the risk that active market participants will pursue private interests in restraining trade." *North Carolina State Bd. of Dental Examiner v. FTC*, 135 S. Ct. 1101, 1114 (2015).

1. *Midcal*'s First Requirement is Not Satisfied: Arizona Has Not Articulated a Clear and Affirmative Policy to Permit the District's Anticompetitive Conduct.

The Court begins its "uphill" analysis with the understanding that the Supreme Court narrowly interprets state-action immunity. *See City of Seattle*, 890 F.3d at 781 ("State-action immunity . . . is 'disfavored.'"). Here, both parties dispute whether Arizona has articulated a clear and affirmative policy to allow the District's anticompetitive conduct in the retail electricity market. The parties further dispute whether the District's anticompetitive conduct was a foreseeable result of the Arizona legislature's adoption of various statutes on the issue. *See Dakota Territory Tours ACC*¸ 383 F. Supp. 3d at 897; *see also City of Columbia*, 499 U.S. at 372-73; *see also Ticor*, 504 U.S. at 631.

The District claims Arizona adopted a clear and affirmative policy to allow anticompetitive conduct by requiring the District to use a ratemaking process that is inherently anticompetitive.[8] (Memo. at 25 (citing *Southern Motor Carriers Rate Conf., Inc. v. United States*, 471 U.S. 48, 64 (1985)). The District further argues its status as a "natural monopoly" by Arizona's legislature was Arizona's attempt to foreclose competition in the retail electricity market. (*Id*. at 27 (citing A.R.S. § 9-516)).[9] Furthermore, even if Arizona's

---

[8] Section 30-802 defines the procedures for public notice, hearings, comments, and votes before a public power entity adopts terms and conditions for *competition* in the retail sale of electric generation service. *See* A.R.S. § 30-802(A). Entities' rates must also be reasonable. *See* A.R.S. § 30-805.

[9] The District cites § 9-516(A) in support, which states: "It is declared as the public policy of the state that when adequate public utility service under authority of law is being

policy is unclear, the District claims Arizona intended to oust competition for the District by exempting it from antitrust liability under A.R.S. § 48-247.[10] (Memo. at 27-28.) Plaintiffs argue Arizona's legislature intended to promote competition by requiring that public power entities "open their entire service territories to competition," and "adopt a code of conduct to prevent anticompetitive activities that may result from the public power entity providing both competitive and noncompetitive services to retail electric customers." (Resp. at 23, 25 (citing A.R.S. § 30-803(A) and (F)). Plaintiffs also cite A.R.S. § 40-202, which first acknowledges an existing anticompetitive retail electricity market and then states: "It is the public policy of [Arizona] that a competitive market shall exist in the sale of electric generation service."

The numerous, conflicting statutes cited by the parties belie any adoption of a clear and affirmative policy or foreseeable result of a statute permitting anticompetitive conduct in the retail electricity market. If anything, the statutes signal a shift by Arizona's legislature to *promote* competition in the retail electricity market in the future. *Compare* A.R.S. § 40-202 ("It is the public policy of [Arizona] that a competitive market shall exist in the sale of electric generation service.") *with* A.R.S. § 9-516(A) ("It is declared as a public policy of the state that when adequate public utility service under authority of law is being rendered in an area, . . . a competing service and installation shall not be authorized."). The fact that competition may or may not have materialized is not the question here. (*See* Memo. at 29) ("[T]he ACC has not elected to move forward with retail competition of any sort."). Rather, the Court looks to whether Arizona clearly and affirmatively ousted competition, which these statutes surely do not indicate such a thing.

Furthermore, just because Arizona's legislature requires that the District use ratemaking does not necessarily mean a clear and affirmative policy to allow anticompetitive conduct in the retail electricity market exists. *See City of Seattle*, 890 F.3d at 782 ("The state's authorization must be plain and clear."). Regardless of whether

---

rendered in an area, . . . a competing service and installation shall not be authorized . . . by a city or town[.]" A.R.S. § 9-516(A).
[10] The District cites § 48-247, which exempts "conduct or activity of a district . . . approved by a statute of [Arizona]" from antitrust liability.

ratemaking is "inherently anticompetitive," as the District argues, (Memo. at 25-26), Arizona's requirement that the District use ratemaking does not mean it intended to affirmatively permit the District's allegedly anticompetitive conduct. In light of the conflicting statutes above declaring Arizona's policy relating to retail electricity market competition, the Court is hesitant to infer a policy one way or the other. Although state-action immunity is a legal question, Arizona's legislature, not the Court, must clearly and affirmatively establish a policy to promote the District's anticompetitive conduct. It is not the Court's role to unnecessarily *assume* a policy exists when the test requires a "plain and clear" authorization from the state. *See City of Seattle*, 890 F.3d at 782. Accordingly, state-action immunity is inappropriate.[11]

## C. Plaintiffs' Fourteenth Amendment Equal Protection Claims are Untimely.

Arizona's statute of limitations governs Plaintiffs' federal equal protection claims.[12] *See Wilson v. Garcia*, 471 U.S. 261, 276-80 (1985). Arizona's personal injury statute of limitations is "two years after the cause of action accrues, and not afterward." A.R.S. § 12-542. "A statute of limitations under § 1983 . . . begins to run when the cause of action accrues, which is when the plaintiffs know or have reason to know of the injury that is the basis of their action." *RK Ventures, Inc. v. City of Seattle*, 307 F.3d 1045, 1058 (9th Cir. 2002) (citing *Cabrera v. City of Huntington Park*¸ 159 F.3d 374, 379 (9th Cir. 1998)). To determine when a cause of action accrues, courts look to when the "operative decision" occurred. *Chardon v. Fernandez*, 454 U.S. 6, 8 (1981). Inevitable consequences resulting from the operative decision are not separately actionable. *RK Ventures*, 307 F.3d at 1058.

The question is when the "operative decision" occurred. The District argues Plaintiffs' equal protection claims "accrued no later than 2015 when the E-27 rate was adopted." (Memo. at 37-38.) Plaintiffs argue the claims accrued "when they subsequently purchased their solar energy systems and became subject to the discriminatory E-27 [sic]

---

[11] *Midcal*'s second requirement for state-action immunity is not addressed here since Arizona has not adopted a clear and affirmative policy to permit the District's anticompetitive conduct. The Court renders no judgment on whether the District is exempt from *Midcal*'s "active supervision" requirement.

[12] Neither party disputes whether A.R.S. § 12-542 governs Plaintiffs' Fourteenth Amendment equal protection claims brought under 42 U.S.C. § 1983.

rate." (Resp. at 34.) Plaintiffs further argue "new claims accrue each month that they [are] charged the E-27 rates." (*Id.*) Plaintiffs filed this action on February 22, 2019. (Doc. 1.) The Court agrees with the District.

The "operative decision" is the Board's approval of the SEPPs on February 26, 2015. (FAC ¶ 73.) Plaintiffs, presumably already District customers because "all customers within [the Market] generally must purchase some retail electricity from [the District]," (*id.* ¶ 52), knew or reasonably knew the SEPPs were adopted at that time. *See RK Ventures*, 307 F.3d at 1058. Plaintiffs' statute of limitations does not sit idle until they decide to install solar panel systems after the SEPPs were adopted. This result would be absurd. District customers could essentially challenge the SEPPs in perpetuity by simply waiting to install solar energy systems until they were ready to file a lawsuit. Similarly, recurring monthly bills are inevitable consequences of the initial "operative decision" and do not toll the statute of limitations. *RK Ventures, Inc.*, 307 F.3d at 1058. This too would allow lawsuits in perpetuity. Thus, Plaintiffs' Fourteenth Amendment equal protection claims are untimely.

### D. <u>Arizona's Actions Against Public Entities and Public Employees Act Bars Plaintiffs' State Law Claims.</u>

Section 12-821.01 states:

> Persons who have claims against a public entity . . . shall file claims with the person or persons authorized to accept service for the public entity . . . within one hundred eighty days after the cause of action accrues. The claim shall contain facts sufficient to permit the public entity . . . to understand the basis on which liability is claimed. The claim shall also contain a specific amount for which the claim can be settled and the facts supporting that amount. Any claim that is not filed within one hundred eighty days after the cause of action accrues is barred and no action may be maintained thereon.

A.R.S. § 12-821.01. "The purpose of [§ 12-821.01's] notice requirement is to allow the public entity or employee to 'investigate and assess liability,' to 'permit the possibility of settlement prior to litigation,' and to 'assist the public entity in financial planning and budgeting.'" *Payne*, 2009 WL 3756679, *11 (quoting *Falcon v. Maricopa Cty*, 213 Ariz.

525, 527, 144 P.3d 1254, 1256 (2006)). Section 12-821.01's requirements are strictly applied. *See Nored v. City of Tempe*, 614 F. Supp. 2d 991, 996 (D. Ariz. Jun. 26, 2008); *see also Deer Valley Unified Sch. Dist. No. 97 v. Houser*, 214 Ariz. 293, 298 n. 6 152 P.3d 490, 496 n.6 (2007).

As the statute explicitly states, "A.R.S. § 12-821.01 requires persons who have claims against a public entity . . . to file a notice of claim with the person authorized to accept service within 180 days after the accrues." *Mothershed*, 2006 WL 381679, at *6. Any claim filed more than 180 days after the cause of action accrues "is barred and no action may be maintained thereon." *See Stulce v. Salt River Project Agr. Imp. & Power Dist.*, 197 Ariz. 87, 90, 3 P.3d 1007, 1010 (Ct. App. 2000). In addition to A.R.S. § 12-821.01's time limit, it also requires a notice of claim adhere to certain substantive requirements. *Id.* For instance, the notice of claim "shall contain facts sufficient to permit the public entity . . . to understand the basis on which liability is claimed [and] . . . a specific amount for which the claim can be settled and the facts supporting that amount." *Id.* "[A] genuine issue of material fact . . . as to whether the requirements of this section have been complied with . . . shall be resolved before a trial on the merits and at the earliest possible time." *Id.*

The District claims that A.R.S. § 12-821.01's compels dismissal of Plaintiff's state law claims. (Memo. at 31-32.) Plaintiffs claim A.R.S. § 12-821.01 does not apply in federal court, but that if it does, it is satisfied here. (Resp. at 27-29.) Again, § 12-821.01 applies in federal court. *See Mothershed*, 2006 WL 381679, at *7 ("federal courts entertaining state-law claims against state entities are obligated to apply the state law notice-of-claim provision"); *see also Payne*, 2009 WL 3756679, at *11 ("§ 12-821.01 applies to all state law claims."). The Court agrees with the District.

As a preliminary matter, the FAC omits any allegations that Plaintiffs even filed the requisite notice of claim. *See Mothershed*, 2006 WL 381679, at *6 ("The Plaintiff's Complaint does not allege that . . . the Plaintiff has ever filed the requisite notice of claim."). In fact, the Notice is only before the Court because the *District* requested it be judicially

noticed. But even if the FAC contained such allegations, Plaintiffs' Notice lacks a "specific amount for which the claim[s] can be settled and the facts supporting that amount." A.R.S. § 12-821.01. The Notice instead includes a brief set of facts, a draft of the complaint, and four settlement conditions. (Doc. 15-2 at 2-3.) The settlement conditions require (1) that the District repeal the E-27 rate; (2) declaratory relief *entered by the court* that the District's conduct is illegal; (3) monetary relief of $1.64 per day per individual for an undefined class; and (4) attorney fees to be determined at a later date. (*Id*. at 3.) All four conditions are prerequisites for Plaintiffs' settlement. (*Id*.) Plaintiffs also explicitly state they "are not willing to settle their individual or class claims absent injunctive and declaratory relief for the entire Class." (*Id*.)

Estrada v. City of San Luis* is especially instructive here. No. CV-07-1071-PHX-DGC, 2007 WL 4025215 (D. Ariz. Nov. 15, 2007). In *Estrada*, the court dismissed plaintiffs' state law claims because their notice of claim under § 12-821.01 lacked sufficient facts supporting their theory of liability and damages claimed. *Id.* at *5. The *Estrada* court reasoned that § 12-821.01 "requires that claimants explain the amounts identified in the claim by providing the government entity with a factual foundation to permit the entity to evaluate the amount claimed." *Id*. (quotations omitted). The *Estrada* court found plaintiffs' notice of claim lacked any indication how they reached the "lump sum" figures included in their notice of claim or what damages stemmed from each of their various fifteen state law claims against defendants. *Id*. The notice of claim's lack of information, the court reasoned, prevented defendant from properly evaluating settlement alternatives and therefore required dismissal of plaintiffs' state law claims. *Id*.

Plaintiffs' Notice similarly lacks sufficient information to permit the District to settle Plaintiffs' claims. Except for the District repealing the E-27 rate, which alone is insufficient to permit settlement, the Notice requests declaratory relief from this Court, monetary relief of an uncertain amount for an unidentified number of class members, and an unspecified amount of attorney fees. (Doc. 15-2 at 3.) Unlike the *Estrada* plaintiffs who actually listed a lump sum, *id.,* Plaintiffs here omit any specific or total amount, let alone

describe which damages stem from each of its nine causes of action. Furthermore, Plaintiffs' unwillingness to settle unless an entire unidentified class obtains relief directly contravenes A.R.S. § 12-821.01's purpose of permitting settlement outside of the court, *see Payne*, 2009 WL 3756679, *11. This vague Notice falls far short of A.R.S. § 12-821.01's strict standards and purposes.

Nevertheless, Plaintiffs' also claim exemption from identifying a "specific amount" because doing so would be a breach of the putative class representatives' fiduciary duties to the other class members.[13] (Resp. at 28-29 ("attempting to settle on an individual basis, to the exclusion of the absent class members, would be a breach of [a putative class representative's fiduciary] duties."). This is incorrect; the "specific amount" requirement applies to putative class actions as well. *See City of Phoenix v. Fields*, 201 P.3d 529, 534 (2009). As the District correctly argues, even a putative class representative's notice of claim must include a specific amount for which his individual claim can be settled. (Memo. at 31-32 (citing *Fields*, 201 P.3d at 534). In *Fields*, the Arizona supreme court explicitly held that "there is no exemption [from 821.01] for putative class claims," in rejecting the argument that "the representatives should be excused from including *any* specific settlement demand in their notice of claim." *Id.* (emphasis in original). While Plaintiffs are correct that § 12-821.01 does not demand a class representative to submit a settlement demand on behalf of the class, a class representative is still required to propose a specific amount for settling their own claim. *Id.* Unfortunately for Plaintiffs' state law claims, they do not propose such an amount in their Notice.

The Notice is also untimely under A.R.S. § 12-821 and A.R.S. § 12-821.01. *See* A.R.S. § 12-821 ("All actions against any public entity of public employee shall be brought within one year after the cause of action accrues and not afterward"); *see also* A.R.S. 12-821.01 ("Persons who have claims against a public entity . . . shall file claims . . . within one hundred eighty days after the cause of action accrues."). As discussed above, the cause of action accrued when the District adopted the SEPPs in 2015. Not only are Plaintiffs'

---

[13] This case is not certified as a class action, but the Court assumes it is for purposes of this argument.

claims inadequate under § 12-821's substantive requirements, but they are also untimely. Accordingly, Plaintiffs' state law claims are dismissed.[14]

### E.  **The LGAA Bars Antitrust Damages.**

The District claims the LGAA bars Plaintiffs' recovery of antitrust damages. (Memo. at 45.) The LGAA prohibits plaintiffs from recovering "damages, interest on damages, costs, or attorney's fees . . . from any local government." 15 U.S.C. § 35(a). "Local government" includes "a school district, sanitary district, or any other special function governmental unit established by State law in one or more States[.]" 15 U.S.C. § 34(1). The LGAA "provides absolute immunity when the terms of the statute are met" and "courts should strive to resolve the immunity issue as early as possible, with minimum of expense and time to the parties." *Sandcrest Outpatient Servs., P.A. v. Cumberland*, 853 F.2d 1139, 1148 n. 9 (9th Cir. 1988); *see also Palm Springs Med. Clinic, Inc. v. Desert Hosp.*, 628 F. Supp. 454 (C.D. Cal. 1986). "[W]hether a defendant is entitled to absolute immunity is a question of law[.]" *Tennison v. City & Cty. Of S.F.*, 570 F.3d 1078, 1087 (9th Cir. 2008).

The District argues the LGAA shields it from antitrust damages because it is a "local government" entity. (Memo. at 45; Repl. at 25.) Plaintiffs argue the LGAA does not shield the District from antitrust liability and legislative history disfavors it. (Resp. at 44.) The Court agrees with the District and prior precedent finding the District immune from antitrust damages liability under the LGAA. *See SolarCity*, 2015 WL 6503439, at *13-14.

### F.  **Failure to State a Claim**

After reviewing the District's defenses, only two causes of action (monopolization; attempted monopolization) under 15 U.S.C. § 2 ("Sherman Act") are not barred.[15] (FAC ¶¶ 120-35.) As alleged, neither can proceed because the FAC inadequately alleges antitrust

---

[14] As a result, the Court need not analyze whether (1) A.R.S. 48-247 bars Plaintiffs' state antitrust claims; or (2) A.R.S. § 12-820.01 immunizes the District from state law damages. Furthermore, the Court does not consider the parties' arguments regarding whether the LGAA bars *state* antitrust damages because Plaintiffs' state antitrust claims are barred by 12-821.01.

[15] Section 4 of the Clayton Act creates a private cause of action for antitrust violations, providing that "any person . . . injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefore." 15 U.S.C. § 15(a).

injury caused by the District, a necessary element for monopolization and attempted monopolization claims.

### 1. Antitrust Claims

"Section 2 of the Sherman Act makes it unlawful for a person to monopolize or attempt to monopolize 'any part of the trade or commerce among the several States.'" *Aerotec Int'l., Inc. v. Honeywell Int'l., Inc.*, 4 F. Supp. 3d 1123, 1136 (D. Ariz. 2014) (quoting 15 U.S.C. § 2). "The purpose of the Act is not to protect businesses from the working of the market; it is to protect the public from the failure of the market." *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 458 (1993). Generally, "a section 2 monopolization claim consists of three elements: [(1)] possession of monopoly power in the relevant market; [(2)] willful acquisition or maintenance of that power; and [(3)] causal 'antitrust injury.'" *Hunt-Wesson Foods, Inc. v. Ragu Foods, Inc.*, 627 F.2d 919, 924 (9th Cir. 1980) (quoting *Cal. Comput. Prods. v. Int'l Bus. Machines Corp.*, 613 F.2d 727, 735 (9th Cir. 1979)); *see also MetroNet Servs. Corp. v. Qwest Corp.*, 383 F.3d 1124, 1130 (9th Cir. 2004).[16]

### a. Plaintiffs Allege Monopoly Power in a Relevant Market.

The District does not challenge whether Plaintiffs allege monopoly power in a relevant market and Plaintiffs do not argue they do. Nevertheless, the FAC plausibly alleges the District's monopoly power in Phoenix's electricity market. (*See* FAC ¶¶ 42-59.) Specifically, the relevant market is the District's service territory in Arizona where they provide 95% of retail electricity; the product market is "the delivery and sale of electric power to residential and commercial consumers within [the District's] service territory"; self-generated solar power serves as a substitute for purchasing electricity from the District; and self-generating solar power customers deprive the District of electricity

---

[16] Although attempted monopolization claims under section 2 of Sherman Act require slightly different elements than a pure monopolization claim, "causal antitrust injury" is required under both theories. *See Rebel Oil Co., Inc. v. Atl. Richfield Co.*, 51 F.3d 1421, 1432-33 (9th Cir. 1995) ("To establish a Sherman Act § 2 violation for attempted monopolization, a private party seeking damages must demonstrate four elements: (1) specific intent to control prices or destroy competition; (2) predatory or anticompetitive conduct directed at accomplishing that purpose; (3) a dangerous probability of achieving 'monopoly power'; and (4) causal antitrust injury.")

sales by creating their own electricity. (*Id.*)

b. Plaintiffs Allege Exclusionary Conduct.

In addition to monopoly power in a relevant market, "[i]t is settled law that [an antitrust violation] requires . . . 'the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident.'" *Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 407 (2004) (quoting *United States v. Grinnell Corp.*, 384 U.S. 563, 570-71 (1966)). Mere "possession of monopoly power will not be found unlawful unless it is accompanied by an element of anticompetitive *conduct*." *Trinko, LLP*, 540 U.S. at 398 (emphasis in original); *see Aerotec Intn'l.*, 4 F. Supp. 3d at 1136-37. In fact, companies "may acquire monopoly power by establishing an infrastructure that renders them uniquely suited to serve their customer [without violating antitrust]." *Id.* "Section 2 claims may be premised upon predatory conduct that is aimed at achieving or maintaining a monopoly in a given market." *ICANN Transparency, Inc. v. VeriSign, Inc.,* 611 F.3d 495, 506 (9th Cir. 2010). Unlawful or exclusionary conduct satisfies this element. *Grinnell*, 384 U.S. at 576.

The District claims the FAC inadequately alleges this element because (1) higher prices for self-generating electricity customers; (2) above-cost price-setting; and (3) higher prices making solar power system economically unfeasible do not allege exclusionary conduct. (Memo. at 34-37.) The District further argues Plaintiffs' installation of solar energy systems after it adopted the SEPPs indicates the absence of exclusionary conduct. (Repl. at 20-21.) Plaintiffs argue this element is adequately alleged because the District purposely disincentivized consumers from installing solar energy systems by raising prices for post-2014 solar customers like Plaintiffs to maintain its electricity monopoly in Arizona. (Resp. at 31-33.)

The Court finds the FAC sufficiently alleges exclusionary conduct by the District. The FAC alleges a pricing scheme differentiating between self-generating solar energy customers and other customers with the sole purpose of fortifying its monopoly against the rising competitive threat of solar power. (FAC ¶ 81.) The FAC specifically alleges:

> Based on the dramatic pricing increase for solar customers subject to the E-27 plan, it is apparent that the purpose . . . is not to recoup reasonable grid-related costs from solar energy customers, but to prevent competition from solar energy systems by penalizing customers for installing these systems and creating disincentives to purchase or lease them [and] . . . resulted in a significant drop in new applications for the installation of solar energy systems in [the relevant market].

(*Id.* ¶¶ 84, 86.) These allegations adequately allege the District's "willful acquisition or maintenance of power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident.'" *Trinko, LLP*, 540 U.S. 398, at 407. Moreover, Plaintiffs allege the District adopted the SEPPs to (1) deter the competitive threat of solar energy systems, (FAC ¶¶ 5-6, 84); (2) penalize solar energy investments to fortify the District's monopoly, (*id.* ¶¶ 5-10); (3) and force consumers to exclusively purchase electricity from the District by making solar energy system installation uneconomical, (*id.* ¶ 87). These allegations, if true, rise to the level of exclusionary conduct by the District to oust competition by solar energy system installers and users in the retail electricity market. Accordingly, Plaintiffs adequately allege exclusionary conduct.

### c.   Plaintiffs Inadequately Allege Antitrust Injury.

"Antitrust injury is defined not merely as an injury caused by an antitrust violation, but more restrictively as 'injury of the type of the antitrust laws were intended to prevent and that flows from that which makes [defendant's] acts unlawful.'" *Glen Holly Entm't, Inc. v. Tektronix*, 352 F.3d 367, 371 (9th Cir. 2003) (quoting *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977)). Antitrust laws protect against anticompetitive conduct, not competition in the marketplace. *U.S. v. Topco Assoc., Inc.*, 405 U.S. 596, 608 (1972). Antitrust injury has four requirements: "(1) unlawful conduct, (2) causing an injury to the plaintiff, (3) that flows from that which makes the conduct unlawful, and (4) that is of the type the antitrust laws were intended to prevent." *Am. Ad Mgmt., Inc. v. Gen. Tel. Co. of Cal.*, 190 F.3d 1051, 1054-55 (9th Cir. 1999). As stated by

the Supreme Court:

> Antitrust laws in general, and the Sherman Act in particular, are the Magna Carta of free enterprise. They are as important to the preservation of economic freedom and our free-enterprise systems as the Bill of Rights is to the protection of our fundamental personal freedoms.

*Topco*, 405 U.S. at 608. "One form of antitrust injury is "[c]oercive activity that prevents its victims from making free choices between market alternatives." *Glenn Holly Entm't*, 352 F.3d at 374 (citing *Amarel v. Connell*, 102 F.3d 1494, 1509 (9th Cir. 1996)). However, "[antitrust] injury, although causally related to an antitrust violation, nevertheless will not qualify as 'antitrust injury' unless it is attributable to an anti-competitive practice under scrutiny." *Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 334 (1990). This is because "[i]t is inimical to [the antitrust] laws to award damages' for losses stemming from continued competition." *Cargill, Inc. v. Monfort of Colorado, Inc.*, 479 U.S. 104, 109-110 (1986).

The District argues Plaintiffs would have been harmed regardless of its adoption of the SEPPs. (Memo. at 34) ("even if rooftop solar competition had flourished after E-27, Plaintiffs' alleged injury would be the same."). In other words, the District argues its alleged restraint of competition (adopting the SEPPs) did not cause Plaintiffs' economic injuries. (Repl. at 20.) Plaintiffs argue antitrust injury is adequately alleged because they were (1) injured as electricity consumers and competitor and consumer antitrust injury differs; (2) charged higher rates to deter their solar energy investments; (3) and a prior competitor alleged antitrust injury. (Resp. at 29-31.) None of Plaintiffs' arguments persuade the Court that antitrust injury is alleged.

Instead, the Court agrees with the District that the FAC fails to allege antitrust injury. Undoubtedly, the FAC alleges harm to Plaintiffs occurring after the District adopted the SEPPs. (FAC ¶¶ 87, 90-92, 130.) For instance, the FAC alleges the SEPPs "made it economically unfeasible for customers to install solar energy systems" or, in other words,

that self-generating solar energy was economically feasible before the District adopted the SEPPs. (*Id.* ¶ 92.) However, the FAC contains no allegations that the District unlawfully restrained competition, the principal evil of antitrust laws. If anything, the District's higher prices for solar energy customers *encourages* competition in alternative energy investment by allowing for new market entrants with its higher prices. Moreover, the FAC even concedes that "technologies that would allow consumers to completely remain off the grid are not yet economically viable." (*Id.* ¶ 52.) Indeed, the FAC alleges solar energy systems are *still* uneconomical. (FAC ¶ 92.) Thus, as the District correctly argues, its alleged anticompetitive conduct of adopting the SEPPs did not cause Plaintiffs' injury because they would have been harmed anyway from using an uneconomical product. Antitrust laws seek to eliminate injuries arising from anticompetitive conduct, not just market injuries tangentially related to antitrust violations from using uneconomical products. *See Topco Associates, Inc.*, 405 U.S. at 608. Because the FAC lacks sufficient allegations relating to how Plaintiffs' injuries are attributable to any anticompetitive conduct, antitrust injury is inadequately alleged.[17]

## VI.   LEAVE TO AMEND

"Dismissal is a harsh penalty and is to be imposed only in extreme circumstances." *Henderson v. Duncan*, 779 F.2d 1421, 1423 (9th Cir. 1986) (citing *Raiford v. Pounds*, 640 F.2d 944, 945 (9th Cir. 1981). In accordance with well-settled law in the Ninth Circuit, the Court will grant Plaintiffs leave to amend their complaint because "it is not 'absolutely clear' that [Plaintiffs] could not cure [the amended complaint's] deficiencies by amendment." *See Jackson v. Barnes*, 749 F.3d 755, 767 (9th Cir. 2014) (citations omitted); Fed. R. Civ. P. 15(a)(2) ("leave to amend should be "freely" given "when justice so requires[]").

---

[17] The Court does not address whether Plaintiffs adequately allege antitrust standing because antitrust injury is not alleged. *See Glen Holly Entm't*, 352 F.3d at 371-73 ("Only those who meet the requirements for 'antitrust standing' may pursue a claim under the Clayton Act; and to acquire 'antitrust standing,' a plaintiff must adequately allege and eventually prove 'antitrust injury.'"). Nevertheless, the Court agrees with the District that the "competitor, not the consumer [like Plaintiffs], is the party with antitrust standing to bring a claim of *attempted monopolization*." *Neagle v. Goldman Sachs Group, Inc.*, 2019 WL 1102199, at * 12 (D. Or. Mar. 1, 2019) (emphasis added).

1    Accordingly, within thirty (30) days from the date of entry of this Order, Plaintiffs

2    may submit an amended complaint addressing the deficiencies in claims 1 and 2. Plaintiffs

3    must clearly designate on the face of the document that it is the "Second Amended

4    Complaint." If Plaintiffs decides to file an amended complaint, they are reminded that an

5    amended complaint supersedes the original complaint, *see Lacey v. Maricopa Cty.*, 693

6    F.3d 896 (9th Cir. 2012), and it must be complete in itself and "must not incorporate by

7    reference any part of the preceding pleading, including exhibits," L.R.Civ 15.1. To be clear,

8    Plaintiffs may only amend their complaint as it relates to their antitrust claims under the

9    Sherman Act.

10   **VII.   CONCLUSION**

11   In conclusion, the District's defenses are availing to the extent that they bar

12   Plaintiffs' state law and Fourteenth Amendment equal protection claims and Plaintiffs

13   cannot recover antitrust damages under the Sherman Act. More explicitly, the filed-rate

14   doctrine and state-action immunity are inapplicable. As to the two residual claims that

15   survive the District's defenses and not barred as a matter of law (monopolization and

16   attempted monopolization under the Sherman Act), the FAC inadequately alleges antitrust

17   injury, which is an essential element under antitrust law. If Plaintiffs wish to file a second

18   amended complaint to fix the deficiencies above as they relate to their antitrust claims

19   under the Sherman Act, they may do so within thirty (30) days.

20   Accordingly,

21   **IT IS ORDERED** that the District's Motion, (Doc. 14), is **GRANTED** and claims

22   1 and 2 are dismissed with leave to amend, claims 3-9 are dismissed without leave to

23   amend.

24   **IT IS FURTHER ORDERED** that the District's Request, (Doc. 15), is

25   **GRANTED** as it relates to judicially noticing Exhibit 1, but denied as to the remaining

26   exhibits;

27   **IT IS FURTHER ORDERED** that Plaintiffs may file a Second Amended

28   Complaint within thirty (30) days of this Order. If Plaintiffs fail to file an amended

complaint within thirty (30) days of this Order, the Clerk of Court is directed to terminate this action.

Dated this 10th day of January, 2020.

Honorable Susan M. Brnovich
United States District Judge